UNITED STATES of America, Appellee,

v.

James A. DAUPHINEE,
Defendant-Appellant.

No. 75–1408.

United States Court of Appeals,
First Circuit.

Argued April 6, 1976.

Decided July 13, 1976.

Andrew Good, Boston, Mass., with whom Owens & Brown, Boston, Mass., was on brief, for appellant.

Henry H. Hammond, Asst. U.S. Atty., Boston, Mass., with whom James N. Gabriel, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

Appellant was convicted after a jury-waived trial on a one-count indictment charging him with a violation of 18 U.S.C. App. § 1202(a)(1) by having knowingly received and possessed (in and affecting commerce) a firearm after having previously been convicted of a felony as defined in 18 U.S.C.App. § 1202(c)(2). His basic contention on appeal is that the district court improperly denied his motion to suppress certain evidence obtained as a result of the search of an apartment in Dorchester, Massachusetts. In reviewing the court's ruling on the motion to suppress, we must deal with two separate issues: (1) the effect of an inaccurate statement made on the return of the warrant; and (2) the adequacy of the basis upon which the magistrate found probable cause to issue the search warrant.

On July 23, 1974, law enforcement officers conducted an extensive search of a basement apartment at 485 Gallivan Boulevard in Dorchester. This search was made pursuant to a warrant issued by a federal magistrate. In the course of the search, the officers came upon a .38 caliber revolver,[1] which constituted crucial evidence against appellant and was the focus of his motion to suppress.

On July 26 Special Agent Ingram of the Bureau of Alcohol, Tobacco and Firearms made a sworn return of the warrant in which he stated, "No property was taken pursuant to warrant." Appellant contends that this sworn statement by the government agent was untrue and violative of Rule 41(d) of the Federal Rules of Criminal Procedure,[2] and that the only proper reme-

---

1. The warrant authorized the officers to search the apartment for "a quantity of hand grenades"; it made no mention of firearms or other potentially incriminating items. It is clear from the record that the discovery of the .38 caliber revolver was an accidental fruit of the search for the grenades.

   The affidavit accompanying the application for the warrant stated that it was believed that one Arthur Flaherty occupied the apartment. When the search was made, however, appellant and not Flaherty was in the apartment. The manner in which appellant was linked to the .38 caliber revolver is not relevant to this appeal.

2. Rule 41(d) reads in pertinent part:

   "*Execution and Return with Inventory.* The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken. The return shall be made promptly and shall be accompanied by a

dy is suppression of the evidence seized in the course of the July 23 search. The government replies that by its terms the warrant referred only to a search for "a quantity of hand grenades" and that therefore Special Agent Ingram's declaration was literally true.[3]

■ Although we think that it would have been better practice if the return had stated that the revolver was found and seized, we do not think that the government agent's failure to make an accurate return requires suppression of the evidence in this case. The various procedural steps required by Rule 41(d) are basically ministerial. *United States v. Hall,* 505 F.2d 961, 963–64 (3d Cir. 1974); *United States v. Wilson,* 451 F.2d 209, 214 (5th Cir. 1971), *cert. denied,* 405 U.S. 1032, 92 S.Ct. 1298, 31 L.Ed.2d 490 (1972). Appellant has not demonstrated that he was prejudiced by the failure of the return to mention the revolver, *see United States v. Hall, supra* at 964, and there is no indication that the government was not acting in good faith.[4] Under these circumstances the district court did not err in denying the motion to suppress insofar as it was based on the wording of the return.[5]

Appellant's second principal argument in favor of suppression, challenging the magistrate's finding of probable cause, is somewhat more weighty. Essentially appellant contends that the second part of the two-pronged test enunciated in *Aguilar v. Tex-*

*as,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1962) was not satisfied here. *Aguilar* set forth the following criteria for evaluating an application for a search warrant based on an informer's tip:

> "Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, . . . the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the [items of contraband] were where he claimed they were, and *some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible'* or his information 'reliable'." 378 U.S. at 114, 84 S.Ct. at 1514 (citations omitted) (emphasis supplied).

*See Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Von Utter v. Tulloch,* 426 F.2d 1 (1st Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 50, 27 L.Ed.2d 55 (1970); *Saville v. O'Brien,* 420 F.2d 347 (1st Cir. 1969), *cert. denied,* 398 U.S. 938, 90 S.Ct. 1840, 26 L.Ed.2d 270 (1970).

■ We must, therefore, examine the affidavit which accompanied the application for the warrant to see whether the magistrate had a reasonable basis to conclude that the confidential informer was credible. Since in this instance the affidavit did not indicate that the agent had a basis in experience for having confidence in the informer, we must look to see whether "the in-

---

written inventory of any property taken. . . . ."

**3.** The government maintains that the revolver was actually seized on the basis of the plain view doctrine, *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), rather than "pursuant to [the] warrant." *See* note 5 *infra.*

**4.** One can see on the face of the return that Special Agent Ingram at one time wrote that he had seized a ".38 cal. Smith & Wesson revolver, 4″ barrel, serial number 438557, loaded with 6 rounds of .38 cal. special ammunition." Although these words were scratched out they remain clearly legible on the return, just above the notation that "No property was taken pursuant to warrant." This fact reinforces our inference from the whole record that the government acted in good faith.

**5.** We find no merit in appellant's alternative argument that since the return stated that "[n]o property was taken pursuant to warrant," the search of the apartment and seizure of the gun were "warrantless" and therefore violative of the fourth amendment. The short answer is, of course, that if the warrant authorizing a search for hand grenades was valid (*see* discussion *infra* ), other incriminating evidence could be seized under the plain view doctrine even if not specified in the warrant. *See United States v. Canestri,* 518 F.2d 269, 274 (2d Cir. 1975); *United States v. Golay,* 502 F.2d 182, 184–86 (8th Cir. 1974). *See also Seymour v. United States,* 369 F.2d 825, 827 (10th Cir. 1966), *cert. denied,* 386 U.S. 987, 87 S.Ct. 1297, 18 L.Ed.2d 239 (1967) and cases cited.

**4**

former's story include[d] the underlying facts and circumstances from which the informant drew his conclusions concerning the subject's criminal conduct *and* the agent then sufficiently verifie[d] enough of them to justify his confidence in the informer." *United States v. Jiminez-Badilla,* 434 F.2d 170, 172 (9th Cir. 1970). *See also United States v. Mark Polus,* 516 F.2d 1290, 1292–93 (1st Cir. 1975).

■ We note preliminarily that the information provided by "A" (one of two confidential informers upon whom the affiant relied)[6] was replete with detail. *See Spinelli v. United States, supra,* 393 U.S. at 416, 89 S.Ct. 584. A brief quotation from Special Agent Ingram's affidavit illustrates the very specific nature of the facts and circumstances recounted by "A":

"Within the past week a confidential informer, hereinafter called 'A', told me that he . was acquainted with Arthur Flaherty and his wife Kathy. He said that Flaherty until recently lived on Samoset Avenue, Hull, Mass., and that he recently moved to Dorchester. 'A' told me that before the move, he was at Flaherty's apartment on Samoset Avenue, and while there, saw two sticks of what appeared to be dynamite. 'A' gave me a detailed description of this material.

. . .

" 'A' told me that at sometime within the past 30 days (I know but do not wish to reveal the exact date) he visited Flaherty's new residence in Dorchester and while there saw a case containing a quantity of hand grenades. He said the case was built to contain approximately 24 grenades, and that three appeared to be missing from the case. 'A' said that the grenades appeared to be loaded, fused, U.S. Government, fragmentation grenades of the old 'pineapple' type. He described the room in which they were located. He said Flaherty was a member of the Devil's Disciples Motorcycle Club,

and that on the occasion he saw the grenades there were numerous other Disciples present."

The detailed information provided by "A" was then corroborated on several points by Special Agent Ingram. For example, although "A" did not give Ingram the exact address of Flaherty's Dorchester apartment, his description of the location was sufficiently detailed to enable Ingram to determine that it was in fact a basement apartment at the Gallivan Boulevard address mentioned above. Ingram actually went to that area on two occasions and observed Flaherty and his wife entering and leaving the apartment in question. Ingram also observed "about 8 males assembled near [Flaherty's] apartment and at least 3 motorcycles." Drawing on his knowledge of the Devil's Disciples (a group with which he was acquainted), Ingram also observed that "[t]he males' appearance was typical of the usual appearance of Devil's Disciples." He further noted in the affidavit that, on the basis of his personal experience, members of the Devil's Disciples "frequently became involved with firearms and explosives." Ingram also drew on his knowledge of dynamite so that he could conclude from the description provided by the informer that " 'A' saw Hercules Brand, 40% gelignite dynamite [in Flaherty's apartment]." Corroboration by the law enforcement officer of these various details in the informer's report could properly support the magistrate's conclusion that the informer was truthful. *See United States v. Harris,* 403 U.S. 573, 580–83, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) (plurality opinion).

Additional, albeit limited, corroboration of "A's" statements was furnished by informer "B". Ingram's affidavit summarizes "B's" report as follows:

"Today Detective Robert Batts, Hull Police Department, advised me that he received certain information from another confidential informer, hereinafter

---

6. The affidavit makes reference to informer "A" and informer "B" but gives no indication of the identity of "A" or "B". Although the affidavit does not *explicitly* so state, it is reasonably clear to us that the affiant was referring to two separate individuals when he spoke of "A" and "B".

called 'B'. Batts said that 'B' tends to exaggerate but is generally reliable. He also said that 'B' had confessed a crime to him recently. Batts said that 'B' told him within the past 10 days that within the prior two weeks he had been to Flaherty's new apartment in Dorchester and that there were a number of Devil's Disciples present, all of whom were armed. 'B' said that he observed a 'ton of guns in there,' and warned Batts not to go in the apartment."

"B's" tip corroborates "A's" as to the facts that Flaherty lived in an apartment in Dorchester and was associated with the Devil's Disciples.

In addition we note that Special Agent Ingram checked Flaherty's criminal record, which included a conviction for assault and battery and for attempted armed robbery as well as various arrests, and included it in his affidavit. This record of violent crime is another factor which, in conjunction with the other indicia of Flaherty's propensities and associations, could properly have influenced the magistrate's decision that there was probable cause to issue the warrant. *See United States v. Harris, supra.*

Attacking the magistrate's finding of probable cause from another angle, appellant also contends that the information provided by "A" was stale. The affidavit of Special Agent Ingram frankly stated that "A" observed the hand grenades "sometime within the past 30 days (I know but do not wish to reveal the exact date)." We must inquire whether, under the circumstances of this case, a time span possibly as long as 30 days [7] between observation of criminal activity and issuance of the warrant was impermissibly long.

■ It is well established that the temporal proximity or remoteness of the events observed has a bearing on the validity of a warrant. *Rosencranz v. United States,* 356 F.2d 310, 315–16 n. 3 (1st Cir. 1966). *See also United States v. Steeves,* 525 F.2d 33, 38 (8th Cir. 1975). But no hard and fast rule can be formulated as to what constitutes excessive remoteness, because each case must be judged in its circumstantial context. *See Sgro v. United States,* 287 U.S. 206, 210–11, 53 S.Ct. 138, 77 L.Ed. 260 (1932); *United States v. Guinn,* 454 F.2d 29, 36 (5th Cir.), *cert. denied,* 407 U.S. 911, 92 S.Ct. 2437, 32 L.Ed.2d 685 (1972); *State v. Tella,* 113 R.I. 303, 308, 321 A.2d 87, 90 (1974).[8] Factors like the nature of the criminal activity under investigation and the nature of what is being sought have a bearing on where the line between stale and fresh information should be drawn in a particular case. *United States v. Steeves, supra* at 38; *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir. 1972).

■ We think that, especially because of the nature of the item sought (hand grenades), the affidavit in this case was not fatally flawed because of staleness. Unlike many other items of contraband, hand grenades are not, to the best of our knowledge, in great demand even by the criminal element in our society; and they do not lend themselves to rapid disposition in the marketplace. It, therefore, was reasonable for the magistrate to conclude that there was probable cause to believe the grenades were still in Flaherty's possession. "[A] valid warrant may issue when the circumstances . . . are such that a person of reasonable prudence would believe that a crime was being committed on the premises to be searched or evidence of a crime was being concealed there." *United States v. Neal,* 500 F.2d 305, 307 (10th Cir. 1974). Our decision to uphold the magistrate's finding of probable cause in this case is made easier

---

7. Although the affidavit stated that "A" observed the grenades "sometime within the past thirty days," for the purpose of determining whether the information was stale we assume that the observation occurred at the most remote date within that time span (viz. 30 days previously). *See State v. Tella,* 113 R.I. 303, 308, 321 A.2d 87, 90 (1974).

8. *See generally* Mascolo, "The Staleness of Probable Cause in Affidavits for Search Warrants: Resolving the Issue of Timeliness," 43 Conn.B.J. 189 (1969); Comment, "A Fresh Look at Stale Probable Cause: Examining the Timeliness Requirement of the Fourth Amendment," 59 Iowa L.Rev. 1308 (1974).

by the principle that "in a doubtful or marginal case a search under a warrant may be sustainable where one without it would fall." *United States v. Ventresca,* 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684 (1965), citing *Jones v. United States,* 362 U.S. 257, 270, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). *See also United States v. Meyer,* 536 F.2d 963 (1st Cir. 1976).

*Affirmed.*