**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jerry Wayne SEARP,**
**Defendant-Appellant.**

**Nos. 77–5330, 77–5331.**

United States Court of Appeals,
Sixth Circuit.

Argued April 21, 1978.

Decided Nov. 6, 1978.

Merritt, Circuit Judge, filed a concurring opinion.

Ron Parry, Jolly, Johnson, Blau & Parry, Newport, Ky., for defendant-appellant in both cases.

Patrick H. Molloy, U. S. Atty., James E. Arehart, Asst. U. S. Atty., Lexington, Ky., for plaintiff-appellee in both cases.

Before PHILLIPS, Chief Judge, MERRITT, Circuit Judge, and PECK, Senior Circuit Judge.

PECK, Senior Circuit Judge.

Jerry Searp has been convicted in federal court of participating in two bank robberies in Covington and Newport, Kentucky. The robberies, committed about two weeks apart, were both carried out by three persons wearing ski masks. Evidence tending to link the defendant to the robberies was discovered during a search of the home of defendant's mother, Goldie Sellers, and was introduced at both trials. Searp was found guilty of the two robberies, and on appeal challenges those convictions, arguing in part that the evidence seized during the search was inadmissible.

The day of the second robbery, Ronald Ploeger was arrested. He had approximately $19,000 of the stolen money in his possession. The next day, during questioning, he implicated Searp and a codefendant, Robert Bell. Working together on the investigation, state police and FBI officers obtained arrest warrants and went to Searp's mother's house, where he frequently stayed, to make the arrest. Searp was not there (he had already fled the state), and Mrs. Sellers (his mother) refused to consent to a search of the house for evidence of the crime.

The police left, but immediately made application for a search warrant. A warrant was issued at 11:27 p. m., by a Kentucky county judge. The preprinted form commanded an "immediate" search by "any policeman of the Commonwealth" of Mrs. Sellers' residence, and was based upon probable cause to believe Searp had committed two violations of state law—burglary of a bank and armed robbery—and that evidence of those crimes would be found in Mrs. Sellers' home. The warrant was supported by an affidavit submitted by an FBI agent. It was promptly executed, the search beginning shortly before midnight and continuing into the early hours of the next morning. A small quantity of the stolen money, three ski masks, and a plastic sack similar to the one containing the money carried by Ploeger were seized.

Searp objected to the admission of the evidence found at his mother's home on the grounds that the police had violated Rule 41(c), Fed.R.Crim.P., which provides that a search warrant "shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." The government argued that this was a state warrant and that the federal rules were inapplicable. There are no Kentucky statutes which mandate a particular procedure in issuing a warrant for a night search, so long as the search is reasonable within the meaning of the fourth amendment.

Assuming that the federal rules applied, the district court ruled that "under all the circumstances," the warrant complied with the federal rule requiring explicit authorization for a night search, since it ordered an "immediate search," and was issued late at night. The district court also ruled that Searp had standing to raise the issue of the legality of the search because he regularly stayed at his mother's house. The government has not challenged that ruling here.

I.

Our federal system has created many interesting legal problems, such as the one raised by this case, where State and federal law overlap. It is to the benefit of both sovereigns to permit and encourage cooperative law enforcement efforts between state police and federal agents. At the same time, the rules governing police conduct, beyond the requirements of the fourth amendment, are not always identical, giving rise to the problem here. Under what circumstances is evidence seized in conform-

ity with state law, but in violation of federal statutory procedures, admissible in federal court?

An analogous situation existed until 1960 with regard to state searches conducted in violation of the fourth amendment. At common law, the admissibility of evidence was not affected by any illegality through which the evidence was obtained. 8 Wigmore, Evidence § 2183. In 1914, however, the Supreme Court ruled that evidence seized by federal officers in violation of the fourth amendment was not admissible in a federal criminal prosecution. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). At the time, the fourth amendment was not considered to be applicable to the states; thus, a search which would have been illegal under federal law could be legally conducted by state officers, and any evidence seized could be handed over "on a silver platter" for use in a federal criminal prosecution. *Id.* at 398, 34 S.Ct. 341.

The obvious practical difficulties engendered by such a rule soon became a problem, and limitations on the doctrine were developed. The temptation to federal officers to use state police to evade the limitations of the fourth amendment was eliminated by the "participation doctrine." If federal agents had participated in an ostensibly state search or if state officers had acted on behalf of the United States, the legality of the search was tested by federal standards, and if the evidence had been seized in violation of the fourth amendment, it was inadmissible in a federal criminal prosecution.

For example, in *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927), a search warrant was issued by a state judge for state offenses and directed to state officers. While legal under the state law at that time, the warrant was inadequate under the fourth amendment because there was no allegation of the factual foundation supporting a finding of probable cause. After the state officer obtained the warrant, he requested that a federal officer accompany him, and evidence of a federal crime was discovered during the search. The Supreme Court ruled that the evidence was inadmissible in a federal prosecution, because of federal participation in the search:

> [T]he federal prohibition agent was not invited to join the state squad as a private person might have been, but was asked to participate and did participate as a federal enforcement officer, upon the chance, which was subsequently realized, that something would be disclosed of official interest to him as such agent.

*Id.* at 32, 47 S.Ct. at 249. The participation doctrine was extended in *Gambino v. United States*, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927), to searches conducted solely by state officers, but on behalf of the federal government, in the sense that the search was solely for evidence of a federal crime. In *Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949), the Court ruled that when a federal agent joined a state search in progress, even though he acted in good faith (i. e., without intent to avoid the limitations of the fourth amendment), and was not the moving force behind the search, the search was still to be judged by federal standards in determining the admissibility of evidence in a federal prosecution:

> The decisive factor . . . is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it. . . . Evidence secured through such federal participation is inadmissible.

*Id.* at 79, 69 S.Ct. at 1374.

With the decisions in *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), holding that the fourth amendment, through the fourteenth amendment, prohibits unreasonable searches and seizures by state officers, and *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669

(1960), rejecting the silver platter doctrine and holding that evidence seized by state officers in violation of the fourth amendment is inadmissible in a federal criminal trial, all of this would have become merely an interesting historical footnote, were it not for the fact that the Federal Rules of Criminal Procedure had come into existence, and the exclusionary rule had been applied to their violation by federal officers. *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) (violation of Rule 5(a) requiring prompt arraignment). Rule 41 is of particular significance, because it governs the standards and procedures to be observed in conducting federal searches. Although the purpose of Rule 41 is the implementation of the fourth amendment, the particular procedures it mandates are not necessarily part of the fourth amendment. The states are not "precluded from developing workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures." *Ker v. California,* 374 U.S. 23, 34, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963).

Thus the temptation to federal officers to take advantage of more lenient or more flexible state procedures in the course of conducting a federal investigation is still a reality. While it is important not to stifle cooperation between federal and state officers, we think it clear that federal officers, investigating a federal crime, must comply with the federal rules governing their conduct. The participation doctrine cases provide guidance here; when a federal officer has participated in a search in an official capacity, his or her conduct, and thus the legality of the search, is to be judged by federal standards.

█ In this case, the investigation into the bank robberies, which were simultaneously state and federal crimes, was a joint undertaking between the Kentucky police and the FBI from the beginning. According to the FBI agent who testified at the suppression hearing, "We work them together." Asked which agency initiated the investigation, he stated that it was "kind-of a simultaneous thing. We just kind-of did it together." An FBI agent was the affiant who swore to the facts supporting the issuance of the warrant, there were five FBI agents present at the search, and a federal agent directed the conduct of the search. This was a federal search for evidence of a federal crime conducted by federal officers. In such a case the fact that the search is also a state search cannot affect the federal agents' duty to comply with the federal rules.

## II.

█ Rule 41(c)(1), Fed.R.Crim.P., provides that a search warrant "shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." We cannot agree with the district court's ruling that these requirements were satisfied by the affidavit and warrant in this case. The federal Rule requires explicit authorization for a night search, and "reasonable cause shown" to the issuing magistrate justifying the unusual intrusion of a search at night. The Rule recognizes that there are times when a night search is necessary; if, for instance, execution would be impossible in the daytime or the property sought is likely to be destroyed or removed before daylight. The Rule requires only some factual basis for a prudent conclusion that the greater intrusiveness of a nighttime search is justified by the exigencies of the situation. The procedural requirements of the Rule ensure that the fact that a nighttime search is contemplated by the police is brought to the attention of a magistrate and that he or she consciously decide whether such a particularly abrasive intrusion is called for in a given situation. In this case, even if we were to accept the argument that the preprinted word "immediately" meant more than the phrase "forthwith," commonly used in warrants, and could suffice as explicit authority for a

night search in a warrant issued at night, there is no record of any "reasonable cause shown" to justify a nighttime search. The affidavit contains no request for a night search, and discloses no facts which would justify such a search, particularly of a private home occupied by a lone woman who was not suspected of being a participant in the crime.

To hold under these circumstances that there has been compliance would eviscerate a federal rule intended to be a substantial protection against unnecessarily abrasive behavior by the police. In this case the fact that the preprinted warrant form used the word "immediately" would permit its circumvention by a happenstance. We must therefore disagree with the reasoning of the Eighth Circuit in *United States v. Sturgeon*, 501 F.2d 1270 (8th Cir.), *cert. denied*, 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667 (1974), although the facts of that case are strikingly similar to those here. A search warrant, based on state crimes, was obtained by two state police officers and two federal agents from a state judge. There was no explicit authorization for a night search, but the warrant was issued at night and the preprinted form stated that it was to be executed immediately. While there was no request for night-search authorization, the affidavits contained sufficient facts to justify such a warrant if one had been requested, thus making a stronger case for a finding of compliance than do the facts here. Based on all the circumstances, the Eighth Circuit held that the federal officers had adequately observed the requirements of the Rule. It seems to us that neither the letter nor the spirit of Rule 41(c) have been satisfied under these facts. The Rule is so constructed that it simply cannot be complied with by chance, because it requires, first, conscious recognition and consideration of the fact that an extraordinary search is contemplated, and, secondly, some record of that consideration in the affidavits and the warrant itself. We conclude that since this warrant lacked specific authorization for a night search, and the affidavit contained no supporting facts to show a particular need for a night search, Rule 41(c) has been violated.

## III.

■ This does not end our inquiry, however. Under the circumstances of this case, we conclude that the application of the exclusionary rule is not warranted. While the police failed to comply with the procedural requirements of Rule 41(c), the search was nevertheless "reasonable," in the constitutional sense, because it was conducted pursuant to a valid state warrant, and met the requirements of the fourth amendment. Furthermore, the undisputed facts clearly show that this violation was not, and could not have been, a result of bad faith on the part of the officers involved, because there were circumstances clearly justifying a night search. Mrs. Sellers knew the police wished to search her home, to find evidence of a crime committed by her son, and while the house could have been placed under surveillance, only an immediate search could prevent the possible destruction of the evidence sought. We think it clear that even though a proper record was not made and a proper authorization was not obtained, any judicial officer would have authorized a night search under these circumstances. Indeed, the Kentucky judge here undoubtedly knew such a search would occur, since he was requested to and did issue the warrant in the middle of the night. Finally, the protection Rule 41(c) provides against frightening surprise searches was not necessary in this case, since it appears clear from the record that Mrs. Sellers knew the police had gone to obtain a warrant and would be returning to search the house.

While these considerations might seem to be inconsistent with the analysis in the preceding section of this opinion, we think it important to differentiate between the *right* to be free from unnecessary and frightening intrusions by the State into our homes in the middle of the night and the *procedures* which have been established to protect that right. In this case the defendant's interests have not been violated, though the procedures were not observed.

This does not mean, of course, that violation of the required procedures is unimportant; indeed the procedures are the only way to prevent infringements of individual rights. Rather, we hold that requiring suppression in all cases would be a remedy out of all proportion to the benefits gained to the end of obtaining justice while preserving individual liberties unimpaired.

We also note that indiscriminate application of the exclusionary rule to non-constitutional violations would likely result in grudgingly narrow rules, drawn as close to constitutional lines as possible, in order to avoid the loss of a conviction through an inadvertent police error. Broader rules, as broad as possible without unduly hampering necessary police investigations, should be encouraged. For instance, full-body searches after traffic arrests have been held to be constitutional. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Nevertheless, they are extraordinarily humiliating, and often unnecessary. A rule prohibiting them except after the observance of procedural safeguards would be desirable, but unlikely if legislators and the police know that even a good faith error, resulting in no prejudice to the defendant, nevertheless would result in suppression of evidence and loss of a conviction. Within reason, the courts must allow the police to police themselves.

There is relatively little law on the question of the use of the exclusionary rule to enforce statutory, as opposed to constitutional, requirements, though it has been firmly established that federal courts have the power, when necessary, to exclude evidence when statutory requirements have not been observed. In *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), an accused was not promptly arraigned in accordance with Rule 5(a), and a confession was obtained while he was being held. The Supreme Court held that the confession could not be admitted against the defendant at trial. A year earlier, exercising its supervisory powers, the Court enjoined a federal officer who had participated in an illegal search from testifying at a state trial, observing:

[The federal rules] are designed as standards for federal agents. The fact that their violation may be condoned by state practice has no relevancy to our problem. . . . The obligation of the federal agent is to obey the Rules. They are drawn for innocent and guilty alike. They prescribe standards for law enforcement. They are designed to protect the privacy of the citizen, unless the strict standards set for searches and seizures are satisfied.

*Rea v. United States,* 350 U.S. 214, 217–218, 76 S.Ct. 292, 294, 100 L.Ed. 233 (1956).

Since then, the exclusionary rule has been frequently applied to cases of violation of the federal rules, *see, e. g., Navarro v. United States,* 400 F.2d 315 (5th Cir. 1968), but there has been little discussion until recently of the policies underlying the use of the rule in such cases, or whether different considerations come into play than when the rule is being applied to violations of the fourth amendment.

For the most part, the federal rules are admirably clear in establishing the procedures which are to be followed in the course of a criminal investigation and trial, but Congress has provided little concrete guidance in determining how the rules are to be enforced, or what remedies are to be provided when they are violated. Thus, the sanctions are largely left to the sound discretion of the courts, based on what they deem "desirable from the viewpoint of sound judicial practice although in no-wise commanded by statute or by the Constitution." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

The use of the exclusionary rule to remedy statutory violations, as an exercise of the supervisory power, requires an exercise of discretion on the part of the court, and we conclude that the rule should not be applied to all cases in which there has been a violation of the rules by the police. Part of the difficulty in analyzing a problem of this sort is that by their nature, the Rules of Procedure blend constitutional limitations on police activity, procedural limitations de-

signed to avoid constitutional violations, and purely administrative "housekeeping" regulations. The remedies, if any, for noncompliance with the rules must vary accordingly. In cases such as this one, in which a joint search has been conducted by both state and federal officers, relying on a state search warrant, we agree with the Fifth and Eighth Circuits that the use of the exclusionary rule should not even be considered unless the federal officers have violated a "Rule-embodied policy designed to protect the integrity of the federal courts or to govern the conduct of federal officers." *United States v. Sellers,* 483 F.2d 37, 43 (5th Cir. 1973), *cert. denied,* 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974); accord, *United States v. Sturgeon,* 501 F.2d 1270 (8th Cir.), *cert. denied,* 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667 (1974). For example, the courts have consistently refused to order suppression, in the absence of a clear showing of prejudice, in cases where the provisions violated were "ministerial," rules which did not implicate substantial enough rights to justify suppression. *United States v. McKenzie,* 446 F.2d 949 (6th Cir. 1971) (procedures for return of a warrant); *United States v. Sturgeon,* 501 F.2d 1270 (8th Cir.), *cert. denied,* 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667 (1974) (failure to designate federal magistrate for return). In *United States v. Dudek,* 530 F.2d 684 (6th Cir. 1976), a case involving a failure to make a proper Rule 41 inventory of items seized during a search, Judge Edwards, speaking for this Court, points out that most of these "ministerial" errors occur after the search, and are not designed to implement the fourth amendment.

Beyond these "housekeeping" provisions, however, the purpose and effect of the various rules vary widely. Therefore, the decision in this case is not intended to be read broadly; it applies only to violations of the procedural requirements governing special permission for night searches. In particular, it should be noted that both the decision and the analysis underlying it are inapplicable to violations of the procedures mandated by the constitution itself, such as the deceptively similar fourth amendment re-

quirement that a neutral magistrate determine probable cause before a search may be conducted. Such procedures, as part of the Bill of Rights, are independent rights on their own, rather than merely being means to an end.

The night search provisions, while not of constitutional stature, are "designed . . . to govern the conduct of federal officers," *Sellers, supra,* at 43, and are "statutory conditions which explicate fundamental purposes of the Fourth Amendment." *United States v. Murrie,* 534 F.2d 695 (6th Cir. 1976). They are safeguards against abusive, arbitrary police actions, especially when, as illustrated by this case, the home of an individual not even suspected of any criminal activity may be searched for evidence of a crime. As the Supreme Court has recognized, night searches are peculiarly offensive. "It is difficult to imagine a more severe invasion of privacy than [a] nighttime intrusion into a private home." *Jones v. United States,* 357 U.S. 493, 498, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958). Recently, Mr. Justice Marshall forcefully expressed the fundamental aversion our society feels toward such intrusions:

> The idea of the police unnecessarily forcing their way into the home in the middle of the night—frequently, in narcotics cases, without knocking and announcing their purpose—rousing the residents out of their beds, and forcing them to stand by in indignity in their night clothes while the police rummage through their belongings does indeed smack of a " 'police state' lacking in the respect for . . . the right of privacy dictated by the U.S. Constitution."

*Gooding v. United States,* 416 U.S. 430, 462, 94 S.Ct. 1780, 1796, 40 L.Ed.2d 250 (1974) (Marshall, J., dissenting).

Nevertheless, the particular procedures mandated before a night search may be conducted are not part of the fourth amendment, and we conclude that suppression should not automatically result from any violation of the rules. A further inquiry into the actual search which occurred is permissible. The courts should be guided

by the principle underlying Rule 52(a), Fed. R.Crim.P., which provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." While this Rule was intended primarily as a codification of the familiar harmless error rule, an aid to defining the scope of appellate review of convictions, it is applicable both in letter and spirit to the courts generally. The Second Circuit has relied on it in refusing to suppress evidence seized during a night search conducted without specific authorization, when the search was of a motel room known to be empty, since its two former occupants were already in custody. *United States v. Ravich,* 421 F.2d 1196 (2d Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970).

█ When there has merely been a violation of the procedural rules governing night searches, suppression, with its attendant potential for a miscarriage of justice, is not justified when there was neither a possibility of bad faith conduct on the part of the police, nor prejudice to the defendant (in the sense that the search might not have occurred or would not have been so abusive if the requirements of the Rule had been observed). The test is met, and suppression would be required when, based on the facts and circumstances known to the police at the time application was made for the warrant, there is a reasonable possibility that permission for a night search would have been refused even if an appropriate request had been made.

In so deciding, we follow the lead of the Second Circuit, *United States v. Burke,* 517 F.2d 377 (2d Cir. 1975), which held:

> [V]iolations of Rule 41 alone should not lead to exclusion unless (1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.

*Id.,* at 386- 387. *Accord, United States v. Dauphinee,* 538 F.2d 1 (1st Cir. 1976). The Third Circuit has adopted a similar, but more restrictive "prejudice" test, requiring suppression "only when the defendant demonstrates prejudice from the Rule 41 violation . . . in the sense that it offends concepts of fundamental fairness or due process." *United States v. Hall,* 505 F.2d 961 (3d Cir. 1974).

Since we conclude that there was no potential in this situation for deliberate evasion of the limitations on night searches by the police, and that no substantial right of the defendant has been infringed, we affirm the decision of the district court admitting the evidence in question. The other issues raised by the defendant do not require discussion, being either without substantial merit, or clearly within the harmless error rule, Fed.R.Crim.P. 52(a). Accordingly, the convictions of appellant are affirmed.

MERRITT, Circuit Judge, concurring.

The opinion of the Court is thoughtful and clear, but considerations of federalism lead me in a different direction. I would hold that Rule 41 is not applicable to the state magistrate or the federal officer in this case.

Here a state magistrate issued a state search warrant to investigate a state crime. The search warrant runs in the name of the "Commonwealth of Kentucky." A state search warrant is very different from a federal search warrant. The power to issue the warrant comes from a different sovereign.

Rule 41 is designed to give federal and state magistrates the power to issue *federal* search warrants for federal crimes, a power they do not have in the absence of statute. *See United States v. New York Tel. Co.,* 434 U.S. 159, 175 n. 23, 179, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977); *United States v. Finazzo,* 583 F.2d 837, 842–845 (6th Cir. 1977). Rule 41 is also designed to give directions to the magistrate in issuing the federal warrant and to give directions to the federal officer in the execution of the federal warrant. The Rule is not designed to give directions to a state magistrate in the issuance of a *state* warrant. It does not prohibit a state magistrate from issuing a

state search warrant to an officer or citizen who is investigating a state crime, including a federal officer. Nor does it purport to regulate the conduct of officers, federal or state, in the execution of state search warrants.

There is no reason for us to say that a federal officer is acting unlawfully under Rule 41 when he executes a state search warrant, valid under state law and the Fourth Amendment, in a manner which is proper under state law and the Fourth Amendment. A federal officer is also a citizen of a state, and when he is acting under its laws, he is acting lawfully. He may execute state search warrants if state law permits. No federal law prohibits it.

Similarly, a state judge should not be held to act unlawfully when he issues a state search warrant which does not comply with Rule 41 but does comply with state law and the Fourth Amendment. I see nothing in Rule 41 to suggest that it was intended to preempt state law, as the majority opinion suggests, when a state judge issues a state search warrant for a state crime to a federal officer. We should hesitate to interfere with valid state rules of civil and criminal procedure. *See Wilson v. U. S. Department of Agriculture, Food and Nutrition Service,* 584 F.2d 137 (6th Cir. 1978).

On the other hand, if I thought that Rule 41 were applicable and the nighttime search in this case violated the Rule, I would not hesitate to apply the exclusionary rule. The integrity of the federal judiciary requires it, as does the need to hold federal officers to the dictates of the Rule when it governs. The Rule itself expressly requires suppression when it says "a person aggrieved by an unlawful search and seizure" is entitled to get his property back "and it shall not be admissible in evidence at any hearing or trial."

I agree with the Court that this nighttime search does not violate the Fourth Amendment, though the issue is troublesome. Exigent circumstances existed here which justified a nighttime search, and the Fourth Amendment has never been held to require absolutely that the search warrant itself deal with this question in advance. Although the nighttime search provision of Rule 41 probably states the better practice, I do not believe the Constitution condemns the procedures of Kentucky and other states that do not require advance clearance by a magistrate for nighttime searches. The reasonableness of a nighttime search may be reliably judged after the fact, as in any case where exigent circumstances are claimed to justify a departure from preferred search and seizure practice. There is, of course, always a danger that federal officers may resort to state warrants whenever it is more convenient or less burdensome than compliance with Rule 41. But there is not even a hint of purposeful evasion in this case, and I therefore fail to see any basis for criticizing the decision of the FBI to join state officers in their application for a state warrant from a state judicial officer in this fast-breaking investigation of a serious crime.

For these reasons, I concur in the result reached by the Court.