**UNITED STATES of America**

v.

**Kevin WOODWARD and Gregory Jackson, Defendants**

No. 00–86–P–C.

United States District Court,
D. Maine.

Nov. 15, 2001.

Leonard I. Sharon, Sharon, Leary & Detroy, Auburn, ME, for Kevin E. Woodward.

E. James Burke, Lewiston, ME, for Gregory L Jackson.

Donald E. Clark, Office of the U.S. Attorney, Portland, ME, for U.S. Attorneys.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS

GENE CARTER, District Judge.

The Court previously denied Defendants' Motion to Suppress. Specifically, the Court determined that the use of a thermal imaging device without a warrant did not violate the Defendants' right to be free from unreasonable searches and that the information contained in the search warrant application, including the results from a thermal imaging scan of the residence, was sufficient to support the issuance of the search warrant in this case. Docket No. 12. Defendant Jackson pleaded guilty, was sentenced, and appealed the Court's decision with respect to the Motion to Suppress to the Court of Appeals for the First Circuit. Before the First Circuit heard Jackson's appeal, the United States Supreme Court decided *Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), wherein it held that the use of a thermal imaging device is a search within the meaning of the Fourth Amendment. As a result of the Supreme Court's decision in *Kyllo*, the First Circuit remanded Jackson's appeal to this Court for further proceedings in light of *Kyllo*. *See* Docket No. 46.

The Court now has before it Defendants' joint Motion to Suppress, in which they seek suppression of all evidence seized from their residence and any evidence derived from the search of their residence. Docket No. 51. Specifically, Defendants argue that without the evidence from the thermal imaging scan, the police officers lacked probable cause to support the issuance of a search warrant. *Id.* The Government opposes the motion, arguing that even without the thermal scan, there was sufficient evidence to establish probable

cause. Docket No. 52. The Court will consider whether, stripped of the evidence resulting from the thermal scan, the evidence was sufficient to establish probable cause to search the residence.

## I. FACTS

In April 2000, Maine Drug Enforcement Agency ("MDEA") Special Agent Eric Audette received information from a Confidential Informant ("CI") that a marijuana-growing operation was being conducted at a residence located at Box 884 on the North Turner Road in Turner; Maine, by Roger Mercier and other individuals who lived at the home. Government Ex. 9D. On more than one occasion in April 2000, the CI had been in the North Turner Road residence where he/she observed more than 50 pounds of processed marijuana and a greenhouse in the kitchen with a few marijuana plants approximately 2–3 feet in height. *Id.* In addition, the CI had seen Mercier in possession of a small automatic or semi-automatic assault weapon while at the Carlin residence. *Id.* In the garage adjacent to the residence, the CI stated, Mercier stored additional firearms. *Id.*

CI informed Agent Audette that Mercier did not live at the North Turner Road address, but used it only to grow and distribute marijuana in order to isolate himself in the event of a raid by police. *Id.* The CI informed Agent Audette that Mercier did not keep any illegal drugs at his own home—337 Berry Road in Turner. *Id.* Mercier had several people working for him and had used approximately six other residences in the Androscoggin, Franklin, Oxford County area that were set up for marijuana cultivation. *Id.* Jennifer Carlin and Kevin (last name unknown) lived at the North Turner Road residence. *Id.*

Once the marijuana was processed, Mercier, Carlin, and Kevin (last name unknown) were in charge of distribution. *Id.* The CI has known Mercier for several years and believed it was his/her responsibility to come forward and inform law enforcement about Mercier's drug trafficking.[1] *Id.* Agent Audette found CI to be credible source of information. *Id.*

Through independent investigation, MDEA knew Mercier to have been convicted in two separate cases in 1993 for drug offenses—marijuana possession and aggravated trafficking. Government Ex. 9E. In addition, MDEA had an extensive file on Mercier as a result of several debriefings of other persons in which Mercier's name had been mentioned as a drug trafficker. *Id.* The most recent information in the MDEA file was provided in December 1996. *Id.*

For the next six weeks, Agent Audette periodically observed the North Turner Road residence, noting that the entire second floor of the residence appeared uninhabited and that dormer windows on that floor were completely covered up, preventing light from entering or exiting. Government Ex. 9D. During that period of time, an officer with the National Guard Counter Drug Program, familiar with the use of carbon dioxide in indoor marijuana-growing operations, observed a carbon dioxide canister just outside the residence. *Id.* Based on this information, MDEA Special Agent Tony Milligan obtained Central Maine Power ("CMP") electric power consumption records for the residence. Government Ex. 9E. The records revealed that during the months of June to September of 1998, the power consumption ran between 22 and 35 kilowatt-hours ("kWh")

---

1. At the time of the investigation, CI was not known to be charged with any criminal offenses.

per day, which was considered to be normal for a residence of that type for that time of year. *Id.* In October 1998, however, power consumption jumped from 33 kWh per day to 46 kWh per day. In November and December 1998, it continued to climb to 50 and 54 kWh, respectively. *Id.* In January 1999, power consumption dropped to 30 kWh per day and stayed within a normal range during February and March 1999. *Id.*

Electric power consumption climbed from 33 kWh per day in March to 48 kWh per day in April 1999. *Id.* Power consumption increased again to 50 kWh in May, and to 59 kWh per day in June and July 1999. *Id.* In August 1999, it dropped to 44 kWh per day, and in September and October 1999, it dropped back to 31 kWh per day. *Id.* With the exception of January, when consumption was at 40 kWh per day, consumption stayed steady and within the normal range for the winter months of 1999 into 2000. *Id.*

On May 13, 2000, the officers went to the public street in front of the residence and used a thermal imaging camera on the North Turner Road residence. *Id.* On May 15, 2000, Agent Audette obtained the most current power consumption reading for the residence for the month of April and the first two weeks of May 2000. *Id.* The updated CMP record indicated that electric power consumption had risen to 40 kWh per day. *Id.*

Agents Audette and Milligan thereafter prepared affidavits as part of an application to obtain a search warrant of Defendants' residence. Government Exs. 9D and 9E. On May 15, 2000, a search warrant was issued by Maine District Court Judge Paul Cote, Jr. Government Ex. 9F. On May 16, 2000, during the search of the residence pursuant to the warrant, the officers found, among other things, a marijuana-growing operation.

## II.  DISCUSSION

Defendants seek suppression of all evidence seized from the search of their North Turner Road residence, arguing that when the results of the infrared camera search are excised from the search warrant affidavit in this case, the remaining facts are insufficient to establish a fair probability of criminal activity. The Government disagrees, asserting that after the information gained from the illegal search is removed, the remaining evidence contained in the affidavits provided a substantial basis for the issuing judge to find probable cause.

■  The Court disagrees with the Government's assertion that it is appropriate to apply the deferential, substantial basis standard of review to the issuing judge's decision when the judge never considered the warrant affidavits purged of tainted information. The Court believes that the proper procedure is for this Court to examine the affidavits for probable cause after excising the tainted averments. *See, e.g., United States v. Herrold,* 962 F.2d 1131, 1138, 1143–44 (3rd Cir.), *cert. denied,* 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992) (When a court reviews an affidavit from which unconstitutionally seized evidence has been excised, it must independently determine if such probable cause remains within the affidavit that a neutral magistrate would have issued the subject warrants.). A Court determines as a matter of law that the warrant affidavits, purged of information gained through the infrared search, nevertheless contains sufficient remaining facts to constitute probable cause for the issuance of the search warrant.

■  Probable cause is assessed in light of the "totality of circumstances." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct.

2317, 2332, 76 L.Ed.2d 527 (1983). In determining whether probable cause for a search warrant exists, the task of the judicial officer "is simply to make a practical, common-sense decision whether, given all circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527. An affidavit in support of an application for a search warrant demonstrates probable cause when it sets forth facts that are sufficient, under the circumstances, to indicate a fair probability of criminal activity. *Id.* at 239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527; *United States v. Jordan,* 999 F.2d 11, 13 (1st Cir.1993) (citations omitted).

■ The initial and the most significant of the information contained in the affidavits came from a confidential informant whose motivation was a civic responsibility to report Mercier's drug trafficking. The CI was not charged with any criminal conduct and, although the CI had apparently never provided information in the past, Agent Audette found the individual to be credible. Often, independent corroboration of information provided by an informant, especially where untested and confidential, is crucial in crediting the informant's information with the requisite reliability. However, the First Circuit has stated that "an informant's reliability need not invariably be demonstrated through a detailed narration of the information previously furnished to law enforcement . . . . Rather, the affidavit may disclose an adequate basis for evaluating the informant's veracity through the very specificity and detail with which it relates the informant's *first-hand* description of the place to be searched or the items to be seized." *United States v. Taylor,* 985 F.2d 3, 5–6 (1st Cir.1993) (citing *United States v. Caggiano,* 899 F.2d 99, 102–103 (1st Cir.1990)). Therefore, even if the informant is unknown and untested, other indicia of reliability may suffice to meet the corroboration requirement.

■ Here, CI's information was sufficiently detailed to satisfy the Court that it should be credited as reliable. CI explained the overall scheme of Mercier's marijuana growing and distribution operation: that is, his use of multiple homes in three adjacent Maine counties for marijuana cultivation and the persons living in those homes for distribution of the drugs. After personally observing the North Turner Road marijuana operation, CI related to Agent Audette information concerning the number and size of marijuana plants as well as the quantity of processed marijuana at the home. CI knew that Mercier did not live at the North Turner Road residence and identified Jennifer Carlin and Kevin (last name unknown) as the occupants of that home. In addition, CI informed Agent Audette of a weapon carried by Mercier and of other weapons kept in the garage adjacent to the North Turner Road residence. The specific details regarding the marijuana cultivation and distribution operation generate an indicia of reliability to the information provided by the CI.

The degree to which a confidential informant's information is corroborated is significant in evaluating whether the information establishes probable cause. In addition to the information provided by the CI, Agents Audette and Milligan's independent investigation effectively corroborated the marijuana-cultivation operation described by the CI. First, independent investigation revealed that Mercier to have been convicted, in two separate cases in 1993, for drug offenses—marijuana possession and aggravated trafficking. In addition, MDEA had an extensive file on

Mercier as a result of several debriefings in which Mercier's name had been mentioned as a drug trafficker. The most recent information in the MDEA file was provided in December 1996. Over the course of his surveillance of the North Turner Road residence, Agent Audette noted that the entire second floor of the residence appeared uninhabited and that dormer windows on that floor were completely covered up, preventing light from entering or exiting. Although the CI did not see a growing operation on the second floor, this information nevertheless corroborates an ongoing marijuana-cultivation operation. The observation by a law enforcement officer of a carbon dioxide canister just outside the residence further supports the finding that there was a marijuana-cultivation and distribution operation at the residence. The information gained as a result of the independent investigation in turn supports the reasonable conclusion that the other information supplied by the CI was correct.

Finally, the affidavit of Agent Milligan contained the CMP records for the North

Turner Road residence. The CMP records indicate that electric service was furnished in the name of Jennifer Carlin—one individual identified by the CI as living at the North Turner Road residence. Analysis of the CMP records reflected two distinct cycles, approximately three months in length—October through December 1998 and April through July 1999—where consumption was significantly higher than at other times during the period from June 1998 through May 2000.[2] *Id.* Agent Milligan testified that these cycles are consistent with the three-month growing cycles typical of an indoor marijuana-growing operation. The updated CMP record, requested by Agent Milligan after the infrared search, indicated that electric power consumption had risen to 40 kWh per day in April and May 2000 after having been in the normal range for the previous seven months, corroborating the information from the CI that marijuana plants were then being grown at the residence.

The Court has some concerns about attributing the increased power usage to

---

**2.** The records revealed that during the months of June to September of 1998, power consumption ran between 22 and 35 kWh per day, which testimony revealed was considered to be normal power consumption of a residence of that type. Government Ex. 9E. In October 1998, however, power consumption jumped from 33 kWh per day to 46 kWh per day. *Id.* In November and December 1998, it again climbed to 50 kWh per day and then to 54 kWh per day. *Id.* In January 1999, power consumption dropped to 30 kWh per day and stayed within the normal range during February and March 1999. *Id.* Power consumption climbed from 33 kWh per day in March 1999 to 48 kWh per day in April 1999. *Id.* Power consumption increased to 50 kWh per day in May and to 59 kWh per day in June and July 1999. *Id.* In August 1999, it dropped to 44 kWh per day. In September, it dropped to 33 kWh per day. In October 1999, it dropped to 31 kWh per day. In the winter months of 1999 into 2000, the highest consumption was

recorded in January 2000 at 40 kWh per day. *Id.*

Defendants questioned the Government witness's opinion that 30 kWh per day is the average power consumption for a single-family dwelling in the United States. On cross-examination, the expert testified that he used Pacific Gas and Electric ("PGE") of California's determination of the average power usage for a single-family dwelling. It is not clear whether PGE had calculated the electric usage based on usage at single-family dwellings in California or whether it had based its average on power usage across the United States. Defendants raised the issue but never offered evidence that the daily electric usage for a single-family dwelling in Maine was different from that of a similar dwelling in California. Thus, for the purposes of this motion, the Court accepts 30 kWh per day as an average power usage for a single-family dwelling of this type in Maine.

marijuana cultivation. The Court's concern results from the fact that, except for six weeks in April and May 2000, the residence was not being surveilled at any period in time covered by the CMP records and the agents' inability to exclude other sensible explanations for the increased usage. In order to satisfy its concern regarding the significance of the dramatic increases in power usage, the Court will consider some other possible explanations for the inconsistent jumps in electric power consumption. The first spike in usage—from October until December 1998—coincides with the heating season in Maine. Agent Audette was "unable to determine whether the residence has an electric or oil hot water heater and whether the residence is heated by oil, gas or electricity." Government Ex. 9E, Milligan Affidavit ¶ 5. If the structure were heated by an electric power source, this could explain the higher than normal usage from October until December 1998. However, the drop in electric power usage to a normal level for a structure of this type for the remainder of the winter heating months justifies a strong inference contrary to any conclusion that the higher usage may be attributed to an electrically powered heating source.

The second spike occurred from April to July 1999. The higher than normal usage during this time partially coincides with the time of year that air conditioners may be used in Maine. Use of air conditioners would cause an increase in power consumption. Although the affidavit of Agent Milligan stated that there were "no visible air conditioners" at the residence during the period of surveillance, air conditioning units may have been used the previous summer and then removed from the windows. *Id.* The Court concludes that the use of removable air conditioning units cannot be totally ruled out as the explanation for the power spike. However, the Court is satisfied that the increase in power consumption for the last month while the residence was being surveilled substantiates the CI's claim that marijuana was currently being grown at the home.[3] Despite the fact that, standing alone, the CMP records in this case may be viewed to be of conflicting effect, they, and the logical inferences they permit, are probative enough to corroborate the other evidence that marijuana was being cultivated at the North Turner Road residence.

In this case, the totality of the circumstances gives rise to a "fair probability" that a search of the target premises will uncover evidence of a crime. Such a fair probability was shown by the reports of one confidential informant's observation that Mercer and others were growing and trafficking drugs out of the North Turner Road residence; Agent Audette's surveillance of the North Turner Road residence, noting that the entire second floor of the residence appeared uninhabited and that dormer windows on that floor were completely covered up, preventing light from entering or exiting; the observation by law enforcement officers of a carbon dioxide canister just outside the residence; and finally, the CMP electric power consumption records for the residence. Even recognizing the equivocal effect of the CMP records, the information in the affidavit still provided probable cause to believe that an ongoing marijuana-cultivation and distribution operation existed at the North Turner Road residence. The Court concludes as a matter of law that the

**3.** Defendants argue that the April and May 2000 CMP records are fruit of the illegal thermal search. The Court determines, *infra,* that the independent source exception permits the use of the records. It is, therefore, appropriate for the Court to consider this evidence when resolving the probable cause inquiry.

expurgated affidavit establishes probable cause to search the residence.

■■■ Defendants next argue that the remaining evidence in the affidavits is fruit of the poisonous tree and must, therefore, be excluded. To be suppressed as such, the remaining information in the affidavits must have "been come at by exploitation of th[e] illegality" as opposed to "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). There have evolved three tests from *Wong Sun*, any one of which, when applicable, establishes that the controverted evidence is not fruit of the poisonous tree when: (1) the evidence was discovered by an independent source, *see Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); (2) the evidence is sufficiently distant in causal connection from the illegal search and seizure so that the connection has become so attenuated as to dissipate the taint, *see Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939); or (3) the evidence inevitably would have been gained even without the unlawful search, *see Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). All the information in the agents' affidavits, except for the April and May 2000 CMP records, was acquired prior to the illegal thermal scan and, therefore, is not factually connected to the illegal search. With respect to the April and May 2000 CMP records, the information contained therein is admissible under the independent source exception. The CI's information, surveillance of the residence, the carbon dioxide canister, and the CMP records from June 1998 through April 2000, provided an independent basis to support the agents' suspicion that there was marijuana being grown at ·the residence. Moreover, the agents had previously lawfully gathered the same type of records for the Carlin residence from CMP. Therefore, although the agents did obtain updated power consumption records from CMP for April and part of May 2000 after they conducted the thermal scan, this evidence was causally independent of the scan.

Finally, Defendants argue that the information in the agents' affidavits is stale. The Government disagrees, arguing that the ongoing nature of a marijuana-growing operation requires several months to complete and, therefore, the gathering of the information will necessarily involve some delay. The Court agrees with the Government.

■■■ Whether information in a search warrant affidavit is sufficiently timely to establish probable cause depends on the circumstances of the case. *United States v. Dauphinee*, 538 F.2d 1, 3–6 (1st Cir.1976) ("[N]o hard and fast rule can be formulated as to what constitutes excessive remoteness, because each case must be judged in its circumstantial context."). Here, the information about the marijuana-cultivation operation from the CI was obtained early in April 2000 based on personal observations made in April. A search warrant for the residence was applied for and obtained on May 15, 2000, and the search was conducted the next day. Therefore, at most, six weeks elapsed between the first information being provided and the search. During that six weeks, the agents surveilled the property and, through independent investigation, gained information to corroborate the CI's information. Under these circumstances, the Court finds that none of the information contained in the agents' affidavits was stale. *See United States v. Hershenow*, 680 F.2d 847, 853 (1st Cir.1982)

(citation omitted) ("Where the information points to illegal activity of a continuous nature, the passage of several months between the observations in the affidavit and the issuance of the warrant will not render the information stale.").

### III.  CONCLUSION

Accordingly, the Court **ORDERS** that Defendants' Motion to Suppress be, and it is hereby, **DENIED.**