**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William Rhys COMSTOCK, Defendant-Appellant.**

Nos. 85–2853, 85–2875.

United States Court of Appeals, Fifth Circuit.

Dec. 3, 1986.

Rehearing and Rehearing En Banc Denied Jan. 13, 1987.

Michael E. Tigar, Austin, Tex. (Court-appointed), for defendant-appellant.

Michael R. Hardy, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before BROWN, RUBIN, and GARWOOD, Circuit Judges:

GARWOOD, Circuit Judge:

Appellant William Rhys Comstock (Comstock) appeals his conviction, following a jury trial, of four controlled substance offense counts charged in two separate two-count indictments which were consolidated for trial. One indictment related to manufacturing and conspiring to manufacture methamphetamine on or about January 7, 1985 at the Lexington Hotel in San Antonio, Texas. The other indictment related to the manufacture, and the possession with intent to distribute, of methamphetamine on or about January 23, 1985 at the Ralph Barrios residence on Piper's Run in San Antonio. Comstock's sole complaint on appeal is that the district court erred in overruling his pretrial motion to suppress, and his trial objections to, the fruits of the January 23, 1985 search of the Barrios residence.

Comstock's challenge in this Court to the January 23, 1985 search is only on the ground that the warrant on which it was based was issued by a Texas justice of the peace, and that a Texas justice of the peace is not a judge of "a state court of record" as required by Fed.R.Crim.P. 41(a) for warrants issued thereunder. Comstock does not dispute that the justice of the peace was authorized under Texas law to issue the warrant, and that a warrant so issued does not violate the Fourth Amendment's requirement of a neutral and detached magistrate. It is likewise undisputed that the warrant was requested by and issued to a San Antonio police department narcot-ics agent on the basis of an adequate showing of probable cause of a violation of Texas criminal law respecting methamphetamines. However, Comstock claims, and the district court determined, that subsequent participation by federal agents in the search, which was foreseen when the warrant was obtained, required the application of Rule 41(a) in this federal prosecution, under our decisions in *Navarro v. United States*, 400 F.2d 315 (5th Cir.1968), and *United States v. Hanson*, 469 F.2d 1375 (5th Cir.1972). Nevertheless, the district court, finding that all officers concerned, state and federal, believed in good faith that the warrant had been issued by a court of record and met the requirements of Rule 41(a), declined to suppress the fruits of the search. We agree with the district court that suppression is not warranted under these circumstances, and hence affirm.

I.

Comstock was prosecuted under two indictments consolidated for trial on charges that he conspired to manufacture the controlled substance methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and that he manufactured the methamphetamine on two occasions and possessed it with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. One indictment—on conspiracy and manufacturing (Cause No. SA 85 CR 92)—pertained to his operation of a methamphetamine laboratory in the Lexington Hotel in San Antonio from on or before January 5, 1985, until on or about January 7, 1985. The other indictment—on manufacturing and possession with intent to distribute (Cause No. SA 85 CR 29)—involved the manufacture of methamphetamine occurring on or about January 23, 1985, in the home of Ralph Barrios on Piper's Run in San Antonio. Comstock was convicted on all counts.[1]

At trial, the prosecution produced evidence indicating that Comstock was a mo-

---

1. Comstock was sentenced to concurrent terms of nine years followed by a special parole term of five years on each of the two counts in Cause No. SA 85 CR 29, relating to the January 23 offenses. He was sentenced to concurrent nine-year terms on each of the two counts in Cause No. SA 85 CR 92, relating to the January 7 offenses, with a special parole term of five years

bile methamphetamine maker.[2] Using chemicals and equipment purchased over the counter at chemical supply houses, Comstock would move into a motel or residence for a few days, and, with the help of various accomplices, convert a bathroom into a functioning methamphetamine factory. After he had "cooked" a batch of the drug or performed an intermediate processing step, he would pack his materials into a vehicle and move on.

## A. The Lexington Hotel

The Lexington Hotel laboratory was discovered virtually intact by law enforcement officials because of a manufacturing accident. After a guest at the Lexington complained of a foul odor, a hotel employee tried to enter a room whose registered occupant was one Gary Ackerson, but was denied access by the room's occupants. Further guest complaints and the fear of a possible explosion caused the hotel management to call the fire department, and firemen entering Ackerson's hastily vacated room discovered in the bathroom apparatus that resembled a chemical still. San Antonio police were notified, and Federal Drug Enforcement Administration (DEA) Agent Lee Phillips obtained a warrant to search the room, executing the warrant on January 7.

From the chemicals and equipment present, Agent Phillips and a DEA chemist concluded that the hotel bathroom had been the site of a working methamphetamine laboratory. Other miscellaneous evidence was found, including a scrap of paper bearing the words "Ralph # 95 Yellow cab" and a telephone number—without area code—labeled "home." Although agents would later discover that Ralph Barrios, the owner of the Piper's Run house, was a San Antonio taxi driver with the same telephone number, the DEA apparently did not discover Barrios' involvement or identity through the Lexington Hotel search. At trial, however, both Ackerson and Barrios—arrested along with Comstock in the Piper's Run search—testified that the laboratory in the Lexington Hotel had been established and operated by Comstock.

## B. Piper's Run

On January 22, 1985, a confidential informant told a San Antonio police narcotics officer, Detective Maurice Rose, that a methamphetamine laboratory was in operation at a residence on Piper's Run in San Antonio. Detective Rose had previously received reliable tips from this informant, and believed the information was trustworthy. Rose was at that time assigned by the San Antonio police department (SAPD) to work with the DEA but still reported to the SAPD. He testified that the operational relationship between the two agencies was "an informal task force" and stated that he would ordinarily call in the DEA whenever he learned that a methamphetamine laboratory was involved. He also stated that it was customary practice for officers from both agencies to execute search warrants when a suspected laboratory was the target of the search. Detective Rose contacted Agent Phillips to tell him about the tip, and the two officers looked at the Piper's Run house that same day to plan how a search could best be executed.

The next day, January 23, Detective Rose applied for a search warrant to a San Antonio justice of the peace, who then issued the warrant to Rose. As testimony at the pretrial suppression hearing revealed, justice of the peace courts were generally—albeit erroneously—believed to be courts of record by local law enforcement officers in San Antonio.[3]

---

on the second (manufacturing) count in that indictment. The sentence on both counts on Cause No. SA 85 CR 92 was made consecutive to the sentence on each count in Cause No. SA 85 CR 29, so that Comstock's total sentence was eighteen years followed by a ten-year special parole term.

**2.** In sustaining the district court's denial of a pretrial motion to suppress, we may consider not only the evidence at the pretrial suppression hearing but also that at the trial itself. *See United States v. Quiroz-Carrasco,* 565 F.2d 1328, 1330 (5th Cir.1978).

**3.** This misconception was shared by the justice of the peace court's assistant court clerk, who testified that when the warrant was issued she was certain the court was a court of record, and that she learned it was not only twenty minutes

Rose testified that he knew he could obtain a valid *state* search warrant from a number of different state courts, including a municipal court conveniently located in the police department building downstairs from his own office, to which he ordinarily went for warrants. He stated that he was aware of the Rule 41 state court of record requirement and that his knowledge of that rule motivated him to seek a warrant not from the nearby municipal court—which he knew was not a court of record[4]—but, instead, from the more distant justice of the peace court, which he believed was a court of record. While he was preparing the warrant application, Detective Rose called DEA Agent Phillips and arranged for the state and federal officers to meet in the vicinity of the Piper's Run residence, but he did not tell Agent Phillips which court would issue the warrant. However, Detective Rose did discuss the court of record requirement with his supervisor, SAPD Sergeant Pat Dotson, who confirmed that a justice of the peace court was a court of record. Sergeant Dotson testified, "It has always been the opinion of all the men in our offices that it was a court of record."

Detective Rose claimed that, at the time the warrant was requested and until after it was executed, he intended to bring state charges against the defendants, but, after entering the Piper's Run residence, he decided to turn the case over to the federal agents because he "just felt they were better qualified and better equipped to handle a case of this magnitude."

There is nothing to suggest that the justice of the peace issuing the warrant believed, or had any reason to believe, that participation of federal officers in the search was likely or contemplated.

Rose further testified that when the warrant was executed some ten to twelve local police officers were present as well as at least three federal agents, including Agent Phillips. Detective Rose entered the Piper's Run residence first. Those arrested in the house included Comstock, Barrios, and Ackerson. As the district court found, on adequate evidence, "Rose and other state officers ... entered the house and gathered the persons inside the living room area. Three federal agents, including Phillips, arrived during the execution of the warrant, and two more came later. The state officers conducted a cursory search of the residence and located the [disassembled methamphetamine] laboratory and other evidence."

Then, Detective Rose, Sergeant Dotson, and Agent Phillips withdrew into an unoccupied bedroom to discuss who should take control of the evidence. Portions of Rose's testimony indicate that he then told Phillips that the warrant was issued by a justice of the peace; at another place, Rose indicates that what he told Phillips was that he had gotten the warrant from "Judge Gutierrez" (there is no evidence that Phillips knew that Judge Gutierrez was a justice of the peace). Phillips' testimony was that he did not look at the warrant, or ask to examine it, and that he did not know what court had issued it. In any event, the testimony of

before she testified in the pretrial hearing. However, Fed.R.Crim.P. 41(a) relies on state law for the determination of whether a particular court meets the court of record requirement, and a justice of the peace court does not meet this standard under Texas law. *United States v. Hanson,* 469 F.2d at 1377 (citing still controlling Texas cases).

**4.** The reliance of Rule 41(a) on state law for classifying courts as "courts of record" renders the status of qualifying state courts subject to change at the action of state legislatures. The Texas legislature has recently conferred court of record status, to some degree, on municipal courts in some Texas cities. *See* Tex.Gov't Code

§§ 30.001–30.404 (Vernon Pamphlet 1986). However, Texas municipal courts were not courts of record in the past, nor are most of them now. *See Navarro v. United States,* 400 F.2d at 316. *See also United States v. Perez,* 375 F.Supp. 332, 334 (W.D.Tex.1974) (we observe that *Perez* is described in this Court's opinion in *United States v. Martin,* 600 F.2d 1175, 1180 n. 9 (5th Cir.1979), and in *Shepard's Federal Citations,* Supplement 1975–1981, as having been affirmed, reference being made to the table at 559 F.2d 28; however, the *Perez* case listed in that table is a different case, involving a different defendant (Marcos Garza Perez) and district court (S.D.Tex.); the Hortencia G. Perez case reported in 375 F.Supp. 332 was not appealed).

Rose, Dotson, and Phillips is unequivocal that both Rose and Dotson, in response to Phillips' inquiries, assured Phillips that the warrant had been issued by a court of record. Moreover, Phillips' testimony reflects that, although he was aware of the "court of record" requirement for federal warrants, and would not have proceeded with the search had he not been informed that the warrant had been issued by a court of record, he nevertheless did not know which Texas courts were courts of record, and would not then have known if a warrant had been issued by a court of record by looking at it. Phillips also testified that he was not aware that Texas justice of the peace courts were not courts of record until he was so informed the day before the suppression hearing. Although Phillips was otherwise an experienced DEA officer, and had assisted in some searches under state warrants, this was the first occasion on which he was the agent in charge of a search conducted under the authority of a state warrant. He had known Rose and Dotson for a considerable time and knew them to be officers who were knowledgeable in state law.

After these discussions with Rose and Dotson, Phillips then telephoned the Assistant United States Attorney to seek his approval for federal prosecution of the case. Although Phillips told the Assistant United States Attorney he had a valid warrant, he did not say—and was not asked—what court had issued the warrant. With federal prosecution authorized, Phillips then participated with the SAPD officers in a more thorough search. The district court found that Phillips "went into each room, labelled evidence and took photographs. The defendants and the evidence were placed into federal custody." Charges were filed only by the federal agents.

The Piper's Run search produced significant quantities of methamphetamine, as well as photographs taken inside the house showing ordinary household items apparently used in processing the drug. In addition, a bedspread from the Lexington Hotel, several chemicals used in making methamphetamine, and components of a portable laboratory were discovered packed into trunks in a pickup truck which Comstock claimed to own. The truck was backed into Barrios' garage, its front visible from the street through the open garage door. During the search, the truck was unlocked by SAPD Officer Salazar with keys which he found inside the house in a pair of pants which Comstock indicated to Salazar were his.

*C. Ruling Below*

Comstock sought to suppress all evidence arising from the search, but his motion was denied after a pretrial suppression hearing.[5] The district court held that the search of the Piper's Run residence was federal in nature because of the anticipated participation of federal agents, and that accordingly compliance with the standards of Rule 41 was required; that the justice of the peace court was not a court of record, thus rendering the warrant not in compliance with Rule 41(a); that this Court's decisions in *Navarro* and *Hanson* required the exclusionary rule to be applied to the evidence seized; but that a good faith exception to the exclusionary rule was appropriate in this case, and that the evidence was therefore admissible.

With respect to the latter ruling, the district court found, *inter alia*, that "Rose and Phillips were acting in good faith"; that Rose and Dotson "believed the justice court was a court of record," which was "the general belief at the police department"; that reasons for this belief included the facts that in the justice of the peace court in San Antonio, all cases, including search warrants, were assigned numbers and logged in a docket book, and a court reporter was present and proceed-

---

5. No question concerning Comstock's standing to complain of the January 23 search has been raised, either below or before this Court; nor did the district court address the matter in any way. We assume, *arguendo*, that Comstock had standing. Further, as we hold that the district court correctly declined to suppress the fruits of the January 23 search, we do not reach the question of whether, had the district court erred in this respect, such error would have been harmless, particularly as to the January 7 offenses.

ings were recorded [6]; that "Phillips did not know the warrant had been signed by a Justice of the Peace"; that Phillips, "who himself did not know which state courts are courts of record, asked the state officers [Rose and Dotson] if the warrant was issued by a court of record and relied on their representation that it was"; and, in effect, that had Phillips not been so informed and believed, he would have "declined to take the case." These findings are findings of fact, whether or not the facts so found may be characterized as "ultimate," and are hence reviewable under the clearly erroneous rule. *See Maine v. Taylor*, ⸺ U.S. ⸺, 106 S.Ct. 2440, 2451, 91 L.Ed.2d 110 (1986); *Pullman-Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *United States v. Mahoney*, 712 F.2d 956, 960–61 (5th Cir.1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3590, 82 L.Ed.2d 887 (1984). We hold that these findings are adequately and affirmatively supported by the record, and are not clearly erroneous. They establish, at the least, that all the officers concerned acted with the affirmatively held good faith belief that, and not with indifference to whether, the warrant was issued by a court of record and was valid.

The district court further found that "[t]he reliance of the executing officers on the validity of the warrant was objectively reasonable." This finding, as distinguished from the findings of the underlying facts on which it is based, is reviewable *de novo. United States v. Maggitt*, 778 F.2d 1029, 1035 (5th Cir.1985), *cert. denied*, ⸺ U.S. ⸺, 106 S.Ct. 2920, 91 L.Ed.2d 548 (1986). We find it unnecessary to determine whether the officers' conduct was "objectively reasonable" as a matter of law. However, based on the underlying facts found by the district court, we hold that their conduct was not reckless. The district court further noted that "[t]he warrant was validly issued under state law, and the evidence it produced could have been used against defendant in state court for a violation of state law." Comstock does not challenge this determi-

nation. Additionally, the district court correctly observed that no challenge had been made to the neutrality or competence of the justice of the peace.

At trial, Comstock lodged timely objections to the admission of all evidence arising from the search, bringing the central issue in this case squarely before this Court.

## II.

We have not been asked to decide whether Comstock's Fourth Amendment rights have been infringed. Comstock does not claim that the search warrant was issued on other than a proper showing of probable cause, that the affidavit supporting it was false, that the issuing magistrate was insufficiently competent or neutral, or that the search was otherwise unreasonable. He contends only that evidence must be suppressed because the state court search warrant was not issued by a court of record as required by Rule 41(a).

On its face, Rule 41 appears to govern the validity of only *federal* search warrants requested by and issued to *federal* law enforcement officers, not of state warrants sought by and issued to local police, as occurred in this case:

"A search warrant authorized by this rule may be issued by a federal magistrate or a judge of *a state court of record* within the district wherein the property or person sought is located, *upon request of a federal law enforcement officer* or an attorney for the government.

"....

"... The warrant *shall be directed to a civil officer of the United States* authorized to enforce or assist in enforcing any law thereof or to a person so authorized by the President of the United States...." Fed.R.Crim.P. 41(a) & 41(c)(1) (emphasis added).

Past decisions of this Court, however, have applied Rule 41(a)'s court of record requirement to exclude in a federal prosecution

---

**6.** The evidence showed this was sometimes done    by tape recorder in lieu of a court reporter.

evidence obtained under an otherwise valid state search warrant, requested by and issued to state officers on a showing of state law violation, where the issuing court was not a court of record and federal officers participated in the search.[7]

In *Navarro v. United States*, 400 F.2d 315 (5th Cir.1968), this Court required suppression of evidence under Rule 41(a) after a Texas city corporation court—not a court of record—issued a warrant at the behest of local police officers, respecting a heroin possession offense. The warrant was executed by two federal agents and two non-federal officers, and the incriminating evidence was discovered by the latter in the presence of the federal agents. Navarro was then arrested by the federal agents, no state charges were filed, and the federal government undertook all subsequent legal action. *Navarro* concluded that the search was a *federal search*, relying on *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927), and *Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949).

*Byars* involved a state search warrant jointly executed by state and federal agents. The Supreme Court held that "[t]he warrant clearly is bad if tested by the Fourth Amendment," 47 S.Ct. at 248, and concluded that Byars' conviction in federal court could not be sustained because a federal agent had participated in executing a search warrant defective by Fourth Amendment standards. The *constitution-*

*ally* impermissible nature of the search is a central theme of the *Byars* opinion:

> "While it is true that the *mere* participation in a state search of one who is a federal officer does not render it a federal undertaking, the court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods....
>
> "... We cannot avoid the conclusion ... that the search in substance and effect was a joint operation of the local and federal officers....
>
> "... The Fourth Amendment was adopted in view of long misuse of power in the matter of searches and seizures ... and the assurance against any revival of it, so carefully embodied in the fundamental law, is not to be impaired by judicial sanction of equivocal methods, which, regarded superficially, may seem to escape the challenge of illegality but which, in reality, strike at the substance of the constitutional right." *Id.* at 249–50 (emphasis in original).

*Lustig* reversed the refusal by a Court of Appeals "to suppress evidence claimed to have been seized in contravention of the Fourth Amendment." 69 S.Ct. at 1372. In *Lustig*, a federal agent, acting on a tip from local police, investigated possible counterfeiting activities taking place in a hotel room. Unable to determine with certainty what was occurring there, he told the local police "that 'something was going on.'" The local police obtained a state

---

7. Apart from any application of Rule 41(a), this warrant would have been clearly valid. The Constitution does not require special qualifications, other than neutrality, of those who issue search warrants. *Shadwick v. City of Tampa*, 407 U.S. 345, 92 S.Ct. 2119, 2123, 32 L.Ed.2d 783 (1972) (nonlawyer can issue valid search warrant); *United States v. Coronna*, 420 F.2d 1091 (5th Cir.1970) (fruits of state search based on warrant issued by state court not of record can be used in federal prosecution). Federal law imposes no barrier on the issuance of federal warrants by a justice of the peace court, if a state's law defines its justice of the peace courts as courts of record. *Cf. United States ex rel. Boyance v. Myers*, 398 F.2d 896, 897 (3d Cir. 1968); *United States v. Melotte*, 95 F.R.D. 380, 382 (D.Nev.1982). Texas justice of the peace

courts are authorized to issue state search warrants. Tex.Crim.Proc.Code Ann. §§ 2.09, 2.10, 2.11, 18.01, 18.03 (defining magistrates as including justices of the peace; describing responsibilities of magistrates). Finally, Rule 41(a)'s reference to state law for the determination of which state courts are courts of record permits Texas constitutional county court judges—who need not be attorneys, *see* Tex.Const. art. 5, § 15, interpretive commentary—to issue federal warrants valid under Rule 41. We take judicial notice that many, though certainly not all, Texas justices of the peace are lawyers. There is no evidence that Judge Gutierrez, who issued this warrant, is not a lawyer. Indeed, he is listed as a member of the Texas bar in a well-recognized legal directory. *See* 1 *Texas Legal Directory* 282, 528 (1985).

arrest warrant, entered the hotel room while its occupants were away, and conducted the search. The federal agent remained at local police headquarters until the evidence had been seized; at that time, he went to the hotel and assumed custody of evidence he thought was material to federal counterfeiting charges. *Id.* at 1373. The *Lustig* opinion further developed the "federal search" doctrine:

"To differentiate between [federal] participation from the beginning of an illegal search and joining it before it had run its course, would be to draw *too fine a line in the application of the prohibition of the Fourth Amendment* as interpreted in Byars....

"... [A] search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter.... It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it. Where there is participation on the part of federal officers it is *not necessary to consider what would be the result if the search had been conducted entirely by State officers.* Evidence secured through such federal participation is inadmissible...." *Id.* at 1373–74 (emphasis added).

Under these precedents, the presence of federal officers "federalizes" a search conducted under a state warrant which violates constitutional rights. The *Navarro* panel forged the final link by extending the *Byars* and *Lustig* decisions to a Rule 41 case, though recognizing that Rule 41(a) looks to state law to determine whether a state court is a court of record.

Noting that "[t]he purpose of Rule 41 is to carry out the mandate of the fourth amendment," 400 F.2d at 318, *Navarro* concluded that suppression of the evidence was required. The Court stated, "The Rules of Criminal Procedure are not merely admonitory. They have the force of law." *Id.* "We cannot agree [with the decisions of other Circuits] that the Rule is 'only a procedural prescription as to the issuance of warrants by the federal courts.'" *Id.* n. 3 (quoting *Gillespie v. United States*, 368 F.2d 1, 4 (8th Cir.1966)). However, *Navarro* expressly eschewed any constitutional basis for its decision, stating, "We do not deal with the validity of the search under the constitutional requirements of the fourth amendment." 400 F.2d at 316 n. 1.

In requiring suppression, *Navarro* relied primarily on *Rea v. United States*, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956), which enjoined federal agents from testifying concerning and producing in a state trial marihuana which they had seized under a constitutionally defective warrant for which "no probable cause existed." 76 S.Ct. at 293. The warrant had been issued by a United States commissioner to federal narcotics agents, and the seized marihuana had been suppressed in the federal prosecution, after which the state prosecution was instituted on a state complaint sworn out by the federal officers. It was apparently conceded that "the Fourth Amendment, as judicially construed, would bar the use of this evidence in a federal prosecution." *Id.* (*see also* Justice Harlan's dissenting opinion characterizing the Court's holding as applying to evidence "obtained in contravention of the Fourth Amendment," *id.* at 294).

*Navarro* also expressed the view that "continuance of the practice herein might well lead to a limited revival of the 'silver platter' practice" condemned in *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). *Navarro*, 400 F.2d at 319–20. *Elkins* held that evidence obtained by state officers in violation of the Fourth Amendment, as made applicable to the states by the Fourteenth, was inadmissible in a federal prosecution notwithstanding that federal officers had no involvement in the search and merely received the evidence on a "silver platter." 80 S.Ct. at 1439, 1447. The opinion in *Elkins* outlined the development of the Fourth Amendment exclusionary rule, beginning with the holding in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 346, 58 L.Ed. 652 (1914), that the Fourth Amendment applies to fed-

eral but not state officials, and the resultant decisions in *Byars* and related cases concerning whether the search was sufficiently federal so that, if contrary to the Fourth Amendment, its fruits were inadmissible in a federal prosecution. However, *Elkins* noted that, by virtue of the decision in *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), "the Federal Constitution ... prohibits unreasonable searches and seizures by state officers," and hence "[t]he foundation upon which the admissibility of state-seized evidence in a federal trial originally rested— that unreasonable state searches did not violate the Federal Constitution—thus disappeared in 1949." *Elkins*, 80 S.Ct. at 1442. *Elkins* went on to reject the silver platter doctrine, stating, "[S]urely no distinction can logically be drawn between evidence obtained in violation of the Fourth Amendment and that obtained in violation of the Fourteenth. The Constitution is flouted equally in either case." *Id.* at 1442–43.

The year following *Elkins*, the Supreme Court in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), took the final step, holding "that all evidence obtained by searches and seizures in violation of the Constitution is, *by that same authority*, inadmissible in a state court." *Id.* 81 S.Ct. at 1691 (emphasis added). *Mapp* also stated that it was *"constitutionally necessary* that the exclusion doctrine ... be also insisted upon as an essential ingredient of the right newly recognized by the Wolf case." *Id.* at 1692 (emphasis added). *Mapp*, however, was not cited in our initial *Navarro* decision (*Navarro I*).

There are two subsequent *Navarro* decisions by this Court. In *United States v. Navarro*, 429 F.2d 928 (5th Cir.1970) (*Navarro II*), we held that use in a subsequent state court prosecution of the physical evidence discovered by the state officers during the joint search should not be enjoined, though the federal officers were enjoined from testifying as to the fruits of their search. In *United States v. Navarro*, 441 F.2d 409 (5th Cir.1971) (*Navarro III*), we held that an officer who was a state agent at the time of the search could testify as to

its fruits at the state trial despite having since become a federal agent, as also could a federal chemist concerning his examination of the evidence and a federal agent as to his delivery of the evidence to the chemist. In *Navarro II*, we recognized that *Mapp* "compromises or partially undermines" *Rea*, but not as to constitutional searches, noting that the search of which Navarro complained "was conducted in accordance with constitutional mandates. Only the more stringent federal rules were violated." 429 F.2d at 930, 931.

After *Navarro*, in *United States v. Hanson*, 469 F.2d 1375, 1376 (5th Cir.1972), this Court held that suppression of evidence was required after a Texas justice of the peace issued a warrant at the behest of local police officers, these nonfederal officers initiated the search in the presence of federal agents, but "the federal government took all of the critical procedural steps and legal actions leading to trial and conviction." *Hanson*, like *Navarro*, relied on *Byars* and *Lustig*, and did not cite *Mapp*. The *Hanson* opinion concluded that *Navarro* required it to hold that "[e]vidence obtained in a federal search pursuant to a search warrant issued by a state court not a court of record under state law is inadmissible in a federal prosecution." 469 F.2d at 1377.

We turn now to consider some other decisions of this Court which have addressed the *Navarro* rationale.

### III.

Apart from *Navarro* and *Hanson*, we have not had occasion to suppress evidence on account of federal participation with state officers in the search and a failure to meet the requirements of Rule 41, where the authorizing state court warrant was valid under state law and the United States Constitution and was applied for by and issued to state officers on a showing of probable cause respecting a violation of state law. So far as *Navarro* was predicated on a desire to avoid the "silver platter" practice or, indeed, on a stringent application of the federal search doctrine exemplified by *Lustig*, it has been somewhat eroded in this Court.

In *United States v. Coronna*, 420 F.2d 1091 (5th Cir.1970), the state court issuing the warrant was not a court of record. We declined to apply *Navarro* despite the fact that after the state officers found counterfeit money the federal officers were called and the counterfeit money was turned over to them at the premises being searched. At the very least, this is a "silver platter." Moreover, with respect to the "federal search" issue, it is hard to discern a basis on which *Coronna* can be deemed nonfederal consistently with the language of *Lustig*.[8]

In *United States v. Sellers*, 483 F.2d 37 (5th Cir.1973), *cert. denied*, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974), federal officers participated in a search under a state court warrant issued to state officers for a state offense. We assumed that the search was a federal search, 483 F.2d at 42, but distinguished between a state court warrant issued "for a violation of federal law" and those "predicated on violations of state law." *Id.* at 43. As to the latter:

"[E]very requirement of Rule 41 is not a *sine qua non* to federal court use of the fruits of a search predicated on the warrant, even though federal officials participated in its procuration or execution. The products of a search conducted under the authority of a validly issued state warrant are lawfully obtained for federal prosecutorial purposes if that warrant satisfies constitutional requirements and does not contravene any Rule-embodied

policy designed to protect the integrity of the federal courts or to govern the conduct of federal officers.

"....

"The proper test to be applied is whether a particular Rule 41 standard is one designed to assure reasonableness on the part of federal officers, or whether the provision merely blueprints the procedure for issuance of federal warrants." *Id.* at 43–44.

On this basis, we "decline[d] to apply" to the warrant in question the "Rule 41 requirement" that the warrant be supported by a probable cause showing of a federal violation, *id.* at 44, a requirement we had previously invoked in *United States v. Brouillette*, 478 F.2d 1171 (5th Cir.1973), to suppress in a federal prosecution evidence seized by federal agents under a warrant applied for and issued to them by a United States commissioner in respect to federal law violations. *Sellers* distinguished *Navarro* on the view that the court of record requirement involved there "was a substantive standard by which the conduct of federal searches should be measured rather than any mere procedural standard." *Sellers*, 483 F.2d at 43.[9] *Sellers* was followed in the analogous case of *United States v. Echols*, 577 F.2d 308, 311 (5th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1288, 59 L.Ed.2d 499 (1979), where the claim, apparently accepted *arguendo*, was that "the federal agent's presence was part of a calculated search for evidence of federal crime."[10]

8. For example, *Lustig* states, "It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was *completely* accomplished, he must be deemed to have participated in it." 69 S.Ct. at 1374 (emphasis added). The opinion also makes clear that the object of the search is not "completely accomplished" for this purpose until the items uncovered are examined and selected for retention at the search site. *Id.* at 1373–74.

9. We are not wholly persuaded by this characterization of *Navarro*: the nature of the court that issued the warrant does not speak to the conduct of the search; the *Brouillette* requirement, not applied in *Sellers*, is no less substan-

tive than the court of record requirement, which appears to be a procedural means to enhance the likelihood either of warrants being issued only on probable cause determined by a neutral magistrate or of being able to later determine whether they were so issued.

10. We also observe that in 1972, subsequent to the searches involved in *Navarro* and *Hanson*, Rule 41(a) was amended to add the clause providing that the warrant be issued "upon request of a federal law enforcement officer or an attorney for the government." Rule 41(c)(1) states that the warrant "shall be directed to a civil officer of the United States" or to a person authorized by the President; while this provision was in effect when *Navarro* and *Hanson* were decided, neither opinion adverts to it.

■ We believe that we are bound by the holdings of *Navarro* and *Hanson* that, in the context of a case such as this, Rule 41(a) is applicable and its requirements have not been met. *Navarro* and *Hanson* further held that the evidence seized must be suppressed, in *Navarro* despite there being "no evidence of bad faith on the part of either the state or federal officers." 400 F.2d at 319. We conclude that the development of exclusionary rule jurisprudence since those two decisions necessitates our careful reappraisal of that conclusion in the light of more recent decisions of this Court and of the Supreme Court.

### IV.

Before turning directly to that subject, we briefly note the developments in other Circuits with respect to the exclusion of evidence obtained in instances where Rule 41 was found applicable but not complied with. By and large, these Courts have not required suppression. In *United States v. Burke*, 517 F.2d 377 (2d Cir.1975), the warrant was issued by a state court at the request of, and based on an affidavit executed by, *both* state and federal officers, and the affidavit alleged *only* a violation of federal law. *Id.* 379, 384. This made it "far more clearly a federal warrant than those in either *Navarro* or *Sellers.*" *Burke*, 517 F.2d at 384. Rule 41(c) was not complied with in that the warrant was not directed to federal officers, did not require search within ten days, and did not designate a federal magistrate to whom return

should be made. *Id.* at 381–82. *Burke* held that "[e]ach of the three provisions here violated is thus a 'Rule-embodied policy designed to protect the integrity of the federal courts *or to govern the conduct of federal officers'* (emphasis supplied)." *Id.* at 385 (quoting *Sellers*). Nevertheless, *Burke* refused to suppress the evidence, observing that

> "violations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *Id.* at 386–87 (footnotes omitted).[11]

Cases involving the provision of Rule 41(c)(1) that search must be in the daytime unless the warrant "for reasonable cause shown" authorizes otherwise, are also instructive. In *United States v. Searp*, 586 F.2d 1117 (6th Cir.1978), *cert. denied*, 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979), state and federal officers made a nighttime search directed by an FBI agent, the warrant having been issued by a state court on the basis of an FBI agent's affidavit disclosing an offense in violation of both state and federal law. The Court held that Rule 41 applied and was not complied with since the warrant did not authorize night search and the affidavit contained no facts which would justify such a search. 586 F.2d at 1122. Nevertheless, the Court not-

---

These provisions suggest that a state court warrant issued at the request of state officers only, directed only to such officers, and based on a probable cause showing of a state law violation, is not intended to be governed by the provisions of Rule 41. Nothing in Rule 41 states that it is applicable to such a warrant, or becomes so because federal officers participate in the search. *See, e.g., United States v. Searp*, 586 F.2d 1117, 1125–26 (6th Cir.1978) (concurring opinion), *cert. denied*, 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979); *United States v. Bedford*, 519 F.2d 650, 654 n. 1, 656 n. 14 (3d Cir.1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976); *United States v. Benford*, 457 F.Supp. 589, 595 (E.D.Mich.1978) (state warrants applied for and obtained by state officers not governed by Rule 41 notwithstanding federal participation). *But see United*

*States v. Maggitt*, 778 F.2d at 1032 n. 2 (applying *Lustig* and *Hanson* standard to determine if search "federal in character" for purposes of Rule 41, but pretermitting determination of validity of warrant thereunder).

**11.** *Burke* distinguished *Navarro*, qualifying the above-quoted pronouncement by stating, "[E]xcept in a case like *Navarro* where, if the court was right in holding that Rule 41 applied, the defect made what was done an unconstitutional warrantless search...." 517 F.2d at 386. We do not accept the "unconstitutional" characterization, for it is contrary to our holding in *Navarro II* that "the search and seizure was conducted in accordance with constitutional mandates. Only the more stringent federal rules were violated." 429 F.2d at 931. *Burke* does not address this portion of *Navarro II*.

ed that "there were circumstances clearly justifying a night search," and observed: "[W]e think it important to differentiate between the *right* to be free from unnecessary and frightening intrusions by the State into our homes in the middle of the night and the *procedures* which have been established to protect that right." *Id.* (emphasis in original). Finding only the latter to have been violated, the Court declined to suppress. It also quoted with approval the passage from *Burke* set out above. 586 F.2d at 1125. Other decisions have likewise refused to suppress the fruits of nighttime searches for failure to comply with the above-noted provisions of Rule 41(c)(1).[12]

Respecting suppression for Rule 41 violations generally, in *United States v. Stefanson,* 648 F.2d 1231, 1235 (9th Cir.1981), the Court stated:

"[U]nless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where,

"(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule."

In *United States v. Loyd,* 721 F.2d 331, 333 (11th Cir.1983), the Eleventh Circuit concurred, stating: "We adopt the standard articulated in *United States v. Stefanson,*" and then quoting the above set out language from *Stefanson.*[13] Decisions in other Circuits also refusing, on some-

what similar grounds, to suppress evidence on account of Rule 41 noncompliance are noted in the margin.[14]

## V.

Turning now to post-*Navarro* and *Hanson* developments in Fourth Amendment exclusionary rule jurisprudence, in *United States v. Williams,* 622 F.2d 830, 840 *et seq.* (5th Cir.1980), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981), we held that the fruits of a warrantless and unconstitutional arrest and search could be admitted into evidence where the officer acted in the good faith reasonable belief that his conduct was constitutional. In *United States v. Mahoney,* 712 F.2d 956 (5th Cir.1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3590, 82 L.Ed.2d 887 (1984), we applied *Williams* to an arrest under a warrant which was invalid on account of its inadequate description of the party to be arrested.

Thereafter, in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), the Supreme Court held that evidence seized under a constitutionally defective warrant should not be suppressed where the officers acted in good faith, objectively reasonable reliance on the validity of the warrant. In *Leon,* the warrant was defective because it was not supported by probable cause, as required by the Fourth Amendment; in *Sheppard,* the warrant failed to conform to the Fourth Amend-

---

**12.** *See United States v. Ravich,* 421 F.2d 1196, 1200–02 (2d Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970) (warrant did not authorize nighttime search); *United States v. $22,287,* 709 F.2d 442, 447–49 (6th Cir.1983) (failure of warrant to authorize nighttime search and of affidavit to show cause for same, though known facts supported).

**13.** We observe that the Eleventh Circuit considers itself bound by decisions of the former Fifth Circuit, which would include *Navarro* and *Hanson. See Bonner v. City of Prichard,* 661 F.2d 1206, 1209–11 (11th Cir.1981) (en banc).

**14.** *See United States v. Pennington,* 635 F.2d 1387, 1390 (10th Cir.1980), *cert. denied,* 451 U.S.

938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); *United States v. Brown,* 584 F.2d 252, 258 (8th Cir. 1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979); *United States v. Mendel,* 578 F.2d 668, 673 (7th Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 422 (1978); *United States v. Dauphinee,* 538 F.2d 1, 3 (1st Cir.1976); *United States v. Hall,* 505 F.2d 961, 963–64 (3d Cir.1974). A contrary view was taken in *United States v. Shorter,* 600 F.2d 585, 588–89 (6th Cir.1979). *Shorter* was recognized but in effect rejected by the Eleventh Circuit in *Loyd,* 721 F.2d at 333, and by the Ninth Circuit in *United States v. Johnson,* 641 F.2d 652, 657 (9th Cir.1980). *See also United States v. Giancarli,* 617 F.Supp. 551, 553–54 (S.D.Fla.1985) (questioning current vitality of *Shorter* ).

ment's requirement that it particularly describe the items to be seized. The *Leon* Court noted that in *Mapp* and some earlier cases it had indicated "that the exclusionary rule is a necessary corollary of the Fourth Amendment," 104 S.Ct. at 3412, but that subsequent cases, principally *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), and *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), rejected this view and established the exclusionary rule as being " 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect....' " *Leon,* 104 S.Ct. at 3412 (quoting *Calandra* ). *Leon* went on to say that whether "the exclusionary sanction is appropriately imposed in a particular case" is a question which "must be resolved by weighing the costs and benefits of preventing the use" of the evidence. *Id.* This theme was repeated later in the opinion:

> "As yet, we have not recognized any form of good-faith exception to the Fourth Amendment exclusionary rule. But the balancing approach that has evolved during the years of experience with the rule provides strong support for the modification currently urged upon us. As we discuss below, our evaluation of the costs and benefits of suppressing reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate leads to the conclusion that such evidence should be admissible in the prosecution's case-in-chief." *Id.* at 3416 (footnote omitted).

Plainly, *Navarro* and *Hanson,* which considered suppression the automatic consequence of violation of Rule 41(a), can no longer stand in light of *Leon* and *Sheppard.* Guided then by *Leon,* we must apply a "balancing approach" and evaluate "the costs and benefits of suppressing" the evidence.

## VI.

■ We adopt the approach of *Stefanson* and *Loyd* to the problem at hand, *viz:* a state court warrant, valid under state law, issued at the behest of and to state officers, on a probable cause showing of state law violation, where federal participation with the state officers in the search and possible federal prosecution were initially anticipated by the state officers and actually eventuated. Consequently, we hold that, where there is no constitutional violation nor prejudice in the sense that the search would likely not have occurred or been as abrasive or intrusive had Rule 41 been followed, suppression in these circumstances is not appropriate if the officers concerned acted in the affirmative good faith belief that the warrant was valid and authorized their conduct. Good faith in this context implies not only that Rule 41 was not knowingly and intentionally violated, but also that the officers did not act in reckless disregard or conscious indifference to whether it applied and was complied with. On the other hand, for these purposes, we do not mean by "good faith" that the officers' conduct must be objectively reasonable.

We recognize, of course, that in *Leon* and *Sheppard* objective reasonableness was required to avoid suppression where the Fourth Amendment had been violated. Nevertheless, we believe that a less stringent standard is appropriate where, as here, we are not concerned with deterring unconstitutional conduct. The deterrence of *constitutional* violations has frequently been stressed in cases dealing with the exclusionary rule. As above-noted, *Calandra* and *Leon* both describe the exclusionary rule as "a judicially created remedy designed to safeguard Fourth Amendment rights." *See Leon,* 104 S.Ct. at 3412 (quoting *Calandra* ). In *Stone,* the Court said that "[t]he primary justification for the exclusionary rule then is the deterrence of police conduct that violates Fourth Amendment rights." 96 S.Ct. at 3048. Similarly, the Court in *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 1473, 59 L.Ed.2d 733 (1979), observed that the exclusionary rule "has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of secur-

ing the conviction of the specific defendant on trial." [15] In *Williams,* we described "[t]he exclusionary rule" as "a judge-made rule crafted to enforce constitutional requirements." 622 F.2d at 841. The constitutional nexus is likewise reflected in the statement in *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 3034 n. 35, 49 L.Ed.2d 1046 (1976), that "[t]he primary meaning of 'judicial integrity' in the context of evidentiary rules is that the courts must not commit or encourage violations of the Constitution."

In our en banc decision in *United States v. Butts,* 729 F.2d 1514 (5th Cir.), *cert. denied,* 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984), we refused to suppress evidence recovered from an airplane seized as a result of being tracked through the air by a "beeper" affixed inside the cabin. We held that there was no Fourth Amendment violation as there was no reasonable expectation of privacy in the plane's movements in the sky, and the tracking was neither a search nor a seizure. The defendant complained, however, that the "beeper" had been affixed by federal officers under a warrant issued by a United States magistrate which commanded its removal prior to the events in question, and that the warrant had been violated since no effort had been made to remove the "beeper." In holding that this admitted violation of the warrant did not justify suppression, we stated:

> "The purpose of the exclusionary rule is to deter improper police conduct that violates a person's reasonable expectation of privacy under the Fourth Amendment. It does not purport to reach all illegal conduct by officers....
>
> " ....
>
> "The exclusionary rule does not apply to deter wrongful or neglectful official

conduct that does not involve a breach of the Fourth Amendment." *Id.* at 1517–18, 1519 (footnote omitted).

We are not persuaded that *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), also cited by *Navarro* in support of its suppression holding, 400 F.2d at 318, obliterates all distinction, for purposes of determining whether evidence should be excluded in federal criminal trials, between violations of the Federal Rules of Criminal Procedure and violations of the Constitution, or that it requires exclusion for every nonwillful Rule violation. To begin with, *Mallory* and its precursor, *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), were confession cases, involving protracted incommunicado station house questioning by federal officers, where the suspect had not been taken before a magistrate or advised of his right to counsel. In *Mallory,* the suspect was not advised of his right to remain silent or that his statements could be used against him, 77 S.Ct. at 1360, and in *McNabb,* "[f]or two days ... [the suspects] were subjected to unremitting questioning." 63 S.Ct. at 615. *McNabb,* relying on federal statutes requiring that the person arrested be taken immediately before a magistrate, held the confessions inadmissible. *Mallory* held that *McNabb* required the same result for violations of the similar provision of Fed.R.Crim.P. 5(a), and relied on *McNabb*'s characterization of "such unwarranted detention" as leading to "intensive interrogation easily gliding into the evils of 'the third degree.'" *Mallory,* 77 S.Ct. at 1358. Plainly, then, the types of practices condemned in *Mallory* and *McNabb* generally have strong potential relevance to the voluntariness, and hence the reliability, of consequent confessions, and this is true notwithstanding that in a given case the particular confession may in fact be wholly voluntary and reliable.[16]

15. As we have earlier pointed out, *Rea* and *Elkins,* though each invoked the Supreme Court's supervisory power to exclude evidence, as distinct from the then understood principle that exclusion was compelled by or necessarily flowed from the Fourth Amendment itself, nevertheless were grounded on the *unconstitutionality* of the underlying search or seizure.

16. The presence of these considerations is also reflected in the Court's opinion in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which in effect broadened the *McNabb—Mallory* doctrine and applied it to the states. *Miranda* noted that, though they had decreased, there were still instances of use of police violence and third degree practices to procure confessions and that "[u]nless a proper limitation upon custodial interrogation is

Such is simply not the situation in search cases, where violations have no potential relevance to the reliability of the evidence. Moreover, as was subsequently noted in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 1622, 16 L.Ed.2d 694 (1966), *McNabb* and *Mallory* "were ... responsive to the same considerations of Fifth Amendment policy that unavoidably face us now as to the States." By contrast, in our view the nexus between Rule 41(a)'s "of record" requirement and Fourth Amendment policy is substantially more attenuated than that between the *McNabb-Mallory* statutes and rules and the Fifth Amendment. We do not foresee any *Miranda*-type blossoming of *Navarro*.

Finally, we note *Mallory*'s grounding in the proposition, established by *McNabb*, that "police detention of defendants beyond the time when a committing magistrate was readily accessible constituted 'wilful disobedience of law.'" *Mallory*, 77 S.Ct. at 1358–59. *Mallory* and *McNabb*, then, do not argue against refusing to exclude evidence where the violation was *not* willful, but rather was in subjective good faith. We believe this interpretation finds support in *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 2446 n. 7, 65 L.Ed.2d 468 (1980), where the Court observed: "Federal courts may use their supervisory power in some circumstances to exclude evidence taken from the defendant by 'willful disobedience of law,'" (emphasis deleted) (quoting *McNabb*). Similarly, Justice Marshall's dissenting opinion in *Payner*, joined in by Justices Brennan and Blackmun, states:

"In large part when supervisory powers have been invoked the Court has been faced with intentional illegal conduct. It has not been the case that '[t]he criminal is to go free because the constable has blundered,' *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926). In these cases there has been no 'blunder' by the Government agent at all; rather, the agent has intentionally violated the law for the explicit purpose of obtaining the evidence in question." 100 S.Ct. at 2451–52.[17]

---

achieved—such as these decisions will advance—there can be no assurance that practices of this nature will be eradicated in the foreseeable future." 86 S.Ct. at 1613. Likewise, the Court noted that "[t]he potentiality for compulsion is forcefully apparent, for example, in *Miranda* ...." *Id.* at 1618.

**17.** Nor do we consider the decisions in *Nardone v. United States*, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed.2d 314 (1937) (*Nardone I*), *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939) (*Nardone II*), or *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), where suppression ensued on statutory violations, to mandate a different analysis.

The *Nardone* cases concerned a federal statute which made criminal the intercepting or divulging by anyone to "any person" of wire communications without consent of the sender. In *Nardone I*, the Court observed that "[t]o recite the contents of the message in testimony before a court is to divulge the message" and hence violate the statute. 58 S.Ct. at 276. In *Nardone II*, the Court applied the fruit of the poisonous tree doctrine to the retrial following *Nardone I*. In doing so, *Nardone II* was preventing evasion of the statute's command, as construed in *Nardone I*, that evidence of intercepted communications be excluded. Here, by contrast, the officers' violation of Rule 41(a) is not a criminal offense and is essentially constructive, and Rule

41 does not itself mandate the exclusion of evidence obtained in noncompliance with its provisions. *Cf.* Fed.R.Evid. 402.

Further, in the *Nardone* cases, the violation was not one of procedure but of substance, for there was no procedure available under which the communication could have lawfully been intercepted and divulged. *See Nardone I*, 58 S.Ct. at 276. The substantive right of privacy in wire communication was violated. Ultimately, *Miller* is also a substantive rights case, dealing with 18 U.S.C. § 3109's prohibition (the criteria of which the Court construed as applicable to arrests) of forcible entry without the officer's having first been denied admittance after giving notice of his authority and purpose. The *Miller* Court, faced with a middle of the night entrance into an occupied residence, noted the common-law antecedents of section 3109 and described it as "codifying a tradition embedded in Anglo-American law." 78 S.Ct. at 1198. It appears to us that *Miller* regarded section 3109 as embodying the *substantive* right to be free of the jarring fright of sudden unannounced entry into enclosed premises. Here, by contrast, a neutral and detached magistrate, acting on adequately established probable cause, authorized the invasion of appellant's privacy, and the presence of federal officers made the search no more intrusive. Further, read together, *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 1633–34, 10 L.Ed.2d 726 (1963), *id.* at 1636–37 (opinion of Brennan, J.), and *Sabbath v. United States*, 391 U.S. 585,

Here, by contrast, we *are* being asked to let "the criminal go free," not because of any intentional violation of law by the constable, but simply because the constable *has* "blundered" in the very sense spoken of by Justice Marshall. There being no constitutional violation, nor any prejudice in the *Loyd* and *Stefanson* sense, we are unwilling to take this step in the present context.[18]

■ Our evaluation of the costs and benefits of suppressing this highly reliable physical evidence leads us to the conclusion that suppression is not warranted. A trial is, after all, primarily a search for the truth, and society has a strong interest in the conviction of those who have broken its criminal laws. Deterrence of official illegality, and preserving judicial integrity, are also important considerations. But here each weighs much less heavily as the violation is neither of constitutional dimensions nor intentional. Further, there is no prejudice to substantive rights of the kind alluded to in *Loyd, Stefanson,* and *Searp.* While our holding may "put a premium" on ignorance, we think that realistically any such premium is very small in this character of case, considering especially that we do not countenance conscious indifference or reckless disregard; the costs of suppression, in our view, weigh more heavily in the scales.

Following the rule of *Loyd, Stefanson,* and *Searp,* as above-explicated, we hold that the district court did not err in refusing to suppress or exclude the evidence secured by the challenged search. The judgment below is accordingly affirmed.

AFFIRMED.

88 S.Ct. 1755, 1759 n. 8, 20 L.Ed.2d 828 (1968), suggest the Supreme Court's view, at least at that time, that section 3109 mirrors Fourth Amendment values and may indeed simply replicate Fourth Amendment requirements. The nexus between the "of record" requirement of Rule 41(a) and the Fourth Amendment is not nearly so close.

18. Appellant also argues that here the federal officer relied on the state officers, not on the magistrate as such, while in *Leon* and *Sheppard* the reliance was directly on the magistrate. We do not dispute appellant's reading of *Leon* and *Sheppard,* or the possible significance, in a Fourth Amendment context, of the distinction urged by appellant. We decline to give that distinction controlling significance here, largely for the same reasons we decline in the present context to require that the officers' good faith be objectively reasonable. We also observe that in *Williams* we imposed no such requirement of reliance on a magistrate; and that while such reliance was present and expressly noted in *Leon* and *Sheppard,* neither opinion purports to address whether it is a general requirement of the objectively reasonable good faith test.